MRS. JESSIE CUBLEY ET VIR. V. MRS. J. H. BARBEE ET AL.

No. 5777. Decided May 30, 1934.
(73 S. W., 2d Series, 72.)

*W. H. Clark, J. C. Patton* and *Lee R. Stroud,* all of Dallas, for plaintiffs in error.

That the adoption paper and the relinquishment paper were both of them "duly recorded," or, which is the same thing, the intestate and her heirs are estopped to deny. Rossetti v. Bena-

vides, 195 S. W., 208; Larrabee v. Porter, 166 S. W., 395; Best v. Gralapp, 69 Neb., 811, 5 Am. & Eng. Ann. Cas., 491; Bryan v. Johnson, 244 S. W., 264.

Heirship is a necessary consequence of adoption under the statutes. Eckford v. Knox, 67 Texas, 200; White v. Holman, 60 S. W., 437; Clark v. West, 96 Texas, 437; Jordan v. Abney,. 97 Texas, 296.

A married woman may execute a valid adoption instrument without the joinder of her husband and privy examination and acknowledgement are not essential to the validity of the adoption, because proof by witness or ordinary acknowledgment is sufficient. Bell v. Thomsen, 237 S. W., 1109; Turner v. Montgomery, 286 S. W., 625; Legate v. Legate, 87 Texas, 248; Rossetti v. Benavides, 195 S. W., 208; Larrabee v. Porter, 166 S. W., 395.

*Claude C. Westerfeld, Carden, Starling Carden & Hemphill, Handley & Handley* and *Davis & Hatchell,* all of Dallas, for defendants in error.

The necessity of consummating statutory adoption by recording 'in the office of the County Clerk, excludes the idea of adoption by estoppel, or recording by estoppel. The statutory right to use a certain method excludes all others. Especially is this true as to methods of disposing of property after death. Bryan v. Sundberg, 5 Texas, 423; Brackenridge v. Roberts, 114 Texas, 418, 267 S. W., 244; Thompson v. Schmitt, 115 Texas, 53, 274 S. W., 554; Hooks v. Bridgewater, 111 Texas, 122, 129 S. W., 1114.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

Mrs. Jessie Cubley, joined proforma by her husband, brought this suit against Mrs. J. H. Barbee, W. M. Spillars, and others for the establishment of claimed rights in the estate of Mrs. M. L. Leonard. Mrs. Leonard (formerly Mrs. B. F. Thyng) died intestate in the City of Dallas (in 1927), leaving an estate consisting of real estate, cash, and other personal property, valued at approximately $195,000.00

Mrs. Cubley's claim is predicated upon an adoption or attempted adoption, while the defendants in error claim to be heirs of a deceased son of Mrs. Leonard.

Mrs. Jessie Cubley was born Jessie Partridge on July 4, 1882, in Bay City, Michigan. Her father died in 1884. After his death, in the fall of 1884 or early in 1885, Mrs. Partridge (Jessie's mother), with Jessie, then less than three years of

age, came to Longview, Texas, where Mrs. Partridge's father, a railroad man, and his wife, the step-mother of Mrs. Partridge, then lived, and stayed about three months. She sought and obtained employment through an employment agency with a Mrs. Brown, who ran a boarding house in Fort Worth, Texas. Her step-mother not being able to or declining to care for the three year old child, Jessie, Mrs. Partridge took the child to Fort Worth and kept her at the boarding house where employed. She worked at Fort Worth four months, became ill and returned to her father's and step-mother's home at Longview; and being ill and unable to care for Jessie, left her with Mrs. Brown, who said she would care for her and was "coming North in the course of a few months and she would bring the child." From Longview, where she remained three weeks, Mrs. Partridge went to East Saginaw, Michigan, and from there to Flynt in the same state. Before leaving Longview, however, she received a letter from Mrs. Brown asking her to send a power of attorney relative to the custody of Jessie, as parties wanted to take the child but would not do so without some authority. She afterwards learned that by virtue of the power of attorney Mrs. Brown had turned the child over to Mrs. B. F. Thyng, generally known in this record as Mrs. Leonard. While working at Flynt, Michigan, in January, 1888, Mrs. Partridge received a letter from Mrs. Thyng at Chicago, forwarded through her father at Longview, Texas, stating that the child Jessie was very sick and not expected to live. She left Flynt that night for Chicago, and found the child, who was better, at a hotel with Mr. and Mrs. Thyng. She remained at the hotel with Mr. and Mrs. Thyng about a week. During this time they told Mrs. Partridge how much they thought of Jessie, —that they thought as much of her as if she were their own child, and that they would like to "keep her as their own." They stated they were able to and would educate, clothe, and care for her. In fact, they were then giving her music lessons, and had her teacher present, while Mrs. Partridge (at the time of this trial she was Mrs. Fuller) was in Chicago. Mrs. Partridge at first declined to sign and acknowledge the relinquishment of the child, but finally, on the day before she left the city, did do so; and Mr. and Mrs. Thyng signed and acknowledged an "adoption paper." As to the circumstances preceding the signing of this paper, Mrs. Partridge in part said:

"I think the second day was the first time Mr. Thyng said anything about adopting the child. *He said he didn't have any children of his own, and thought as much of Jessie as if she was his own child. They said they would like to adopt her. I*

*don't know if I can remember all they said about adopting her.
He said they wanted to adopt her and I told him I wouldn't
sign any papers of adoption; then every day after that they
talked about it until at last I decided I would let them adopt
her."* (Italics ours.)

The contents of this "adoption paper" and the "relinquish-
ment" of Jessie are not before the Court, except by the testi-
mony of Mrs. Partridge and repeated statements of Mrs. Thyng
made to other persons. Both instruments were taken by Mr.
and Mrs. Thyng at the time, and have never been found. As to
their contents, Mrs. Partridge in part testified.

*"As to whether any instrument was drawn to adopt my
daughter by those people, Thyng and wife, they had papers with
them that they had brought from Texas.*

*"I say a paper was presented to me about adoption. It
was not signed. After it was presented to me, it was signed by
Mr. and Mrs. Thyng. I signed a paper; I signed a paper of
relinquishment; relinquishment of my child to them; I signed
a relinquishment paper and they signed an adoption paper. Mr.
and Mrs. Thyng took both papers; they kept the papers; they
kept both of the papers, the paper that they signed and the
paper I signed.*

*"Mr. Thyng came in one night after supper and brought
in a notary and the papers were signed before him; they were
acknowledged before the notary public.*

\* \* \* \* \* \*

*"I did not see that paper until the day I signed it. Mr.
Thyng took it out of his pocket when I first saw it. That was
the last day I was there. I didn't leave until the next morning;
I didn't leave that night; I left Chicago in the morning.*

*"He took the paper out of his pocket and had the notary
with him at the time. I had told him I would sign the relin-
quishment. I told them I wanted them to bring Jessie up right;
educate her and take care of her. I did not tell them what kind
of a paper I wanted them to sign; I didn't know anything about
it. They said they would sign the adoption papers.*

*"They took the paper out and read it over and the notary
wrote on that; it seems that the paper they had brought didn't
have just what they wanted to do for the child, and the latter
part, of what I gave testimony was in that paper, was written
on there; the notary wrote it on there. I think the rest of it
was typewritten. I don't recollect what was in the typewritten
part only in regard to taking Jessie as their heir; that was in
the typewritten part. This part I have testified about was in
the handwriting of the notary. After he wrote it, they signed*

it; Mrs. Thyng signed it first and Mr. Thyng signed it, and the notary asked them if they were signing it of their own free will and they said they were, and he wrote that in it. I read the paper before I signed it. I read it before the notary ·put this in, that I have testified about, and read it afterwards.

\* \* \* \* \* \*

"That night after signing the papers, I made a request to them: I said, 'Mrs. Thyng, do you think this paper will be all right?' I said, 'You said you brought this paper from Dallas.' I said, 'It has been signed here in Chicago and I am from Michigan,' and she said that she, when she came back, she would have it examined and see if it was all right, and she would write me, but she didn't write me; it went along a number of months and I wrote her in Dallas.

"She told me she brought the paper with her from Dallas.

"I signed the relinquishment papers at the same time, and acknowledged them before the same notary, while we were all there together in the room.

\* \* \* \* \* \* \*

"I say I had the promise of Mrs. Thyng that she would write me about this paper. It went along about three or four months and she didn't write me and I wrote her, to Dallas. I addressed the letter, 'Mrs. M. L. Thyng, Dallas.' No street number; I didn't know her street number. Then I got a letter from her; not right away, but quite a while after that, that I got a reply.

\* \* \* \* \* \* \*

"Mrs. Thyng wrote me and said she had had the papers examined by a lawyer here in Dallas, and she said they were all right, and she said they had been properly recorded and I could rest assured she would do what she claimed she would.

\* \* \* \* \* \* \*

"I testified that I read the adoption papers before I signed them. I read the ones that they signed. The papers stated that they took Jessie for their heir, and also said that at Mr. Thyng's death she was to have half of what they left; the other half was to go to Mrs. Thyng's son; that Jessie was to be taken as their heir, and after their death she was to have half of the estate; the other half to go to Mrs. Thyng's son.

"The paper that I signed was that I relinquished her to them; that they were to take her and bring her up, and that I was to have nothing further to do with her; the paper that I signed was that I was giving Jessie up to them. That she would, by me signing the paper, that I would have nothing more, nothing furthermore to say about her.

\* \* \* \* \* \* \*

"I have never seen the adoption paper since that time. As to whether those papers have been filed in Dallas County, all I know is what Mrs. Thyng said in that letter. The last I seen the adoption paper was when I signed it in Chicago. I never seen it after that. I have never made inquiry to find out where it is; in fact, I never thought that the paper was lost. *I supposed, of course, it was recorded, the way she said she had."* (Italics ous.)

After the execution of the instruments referred to above, the child Jessie, who had been in the custody of Mr. and Mrs. Thyng for some three years previous, continued in their custody, and was supported and cared for by Mrs. Thyng until Jessie married some nine years later. On the day following the execution of the instruments, Mrs. Partridge left Chicago, and afterwards lived in Michigan and Ohio. She continued ill for about four years.

The execution of the documents referred to by the witness at Chicago was in 1888, at a time when Jessie was not quite six years of age, so young in fact that she did not then know that Mrs. Partridge was her mother, and never learned it until years afterwards.

In the summer of 1888 a man by the name of Munzesheimer, a witness in this case, who lived in Dallas about fifty years, was doing some work at the Thyng residence in Dallas and heard a lawyer by the name of Mitchell read some papers, concerning which he in part testified:

"As to the nature of that instrument, it was a form of an adoption paper. As to what was done with the paper on that occasion, as well as I could remember, Mr. Mitchell had them with him when he left the house. The papers were delivered to him by Mrs. Thyng herself. I do remember a declaration that Mrs. Leonard (Thyng) made at the very time she delivered the papers to him. I remember Mrs. Thyng gave Mr. Mitchel, I think, some money, and asked him to have those papers recorded. I do not remember the amount of money she gave him."

It will be recalled that Mrs. Partridge testified that she wrote Mrs. Thyng as to the adoption papers, and after some time received a reply that the papers were valid and had been filed for record. Subsequent to the transaction just detailed Mr. and Mrs. Thyng were divorced, and in the same year (in 1889) he died in the east, leaving no estate. Mrs. Cubley, (Jessie Partridge), as a child, about seven years of age, was at his funeral.

It will be recalled that Mr. and Mrs. Thyng had a music

teacher for Jessie at the time of the execution of the adoption papers there in 1888. The fact is the child, Jessie, proved to be a musical genius, and Mr. and Mrs. Thyng no doubt knew of her unusual talents at the very time of the negotiations with the mother. We infer, in fact, from the evidence, that they were then touring the child as a musician.

Following the execution of the papers at Chicago, Jessie Partridge became in every essential respect the adopted child of Mr. and Mrs. Thyng. Mr. Thyng, however, lived only about one year thereafter; but the child continued in the same relationship to Mrs. Thyng, who after Mr. Thyng's death was known as Mrs. Leonard. Mrs. Thyng educated Jessie, developed her musical genius to such a point that while yet a small child she appeared on Keith's and other theatrical circuits through a large portion of the country, including the cities of New York, Boston, Chicago, and St. Louis, and many other places. In fact, she visited New York as a musical artist forty-five different times. She received a gold medal when she performed in her home town at the Dallas Fair. She married at fifteen, and at least temporarily retired from the stage; but for some nine years Mrs. Thyng enjoyed the society and income, whatever it was, of the daughter she had attempted to adopt. What the income was the evidence does not disclose. The record, however, justifies the conclusion that the earnings of Jessie were substantial; and, except that which went for her support, she did not receive any portion thereof. Mrs. Carter, a next door neighbor to Mrs. Thyng (Mrs. Leonard), speaking with reference to Mrs. Thyng, said:

"She told me that Jessie was a great cornetist. She told me about her going to the different cities in the United States to perform as a little girl. She said that Jessie was very smart in her music and when she would play everybody was thrilled with the music. She did not say anything with reference to the size of the crowd. She told me that she went on the road with Jessie and Jessie played and they made good money."

Mrs. Thyng (Mrs. Leonard), the adopted mother, died with nearly $200,000 in cash and property; but what part, if any, was derived from the childhood services of Jessie, this record does not show. Let this be said for the dead woman, Mrs. Thyng (Mrs. Leonard): She lived up to the obligation of an adoptive parent, save in the one particular, the entrusting of the adoption deed to a careless lawyer, who apparently did not file the same, *although Mrs. Thyng thought and said it was filed as the law required.* She reared and educated the girl,

who took *her name*, "Leonard," like a mother would, and loved her to the time of her death, when eighty-six years old. On many occasions, from the summer of 1888, when she met Ben Cabell, whom she had known since 1874, and to whom she then stated that the child had been given to her by its mother, substantially until her death Mrs. Thyng said over and over again to many witnesses that Jessie was her adopted daughter. She made these statements upon occasions of introduction or in explanation of the presence of the child with her. Jessie, however, did not know she was an adopted child until she was about twelve years of age, when she learned it for the first time from children with whom she attended school. That the child, Jessie, from the time of her adoption to the day of Mrs. Thyng's death, performed the filial duties of a daughter, this record leaves no room for doubt. The mother, Mrs. Partridge (Fuller), also kept her part of the relinquishment agreement, although she knew from hearsay that Jessie was on the stage as a musician, and knew that she performed in Toledo, Ohio, where Mrs. Partridge (Fuller) resided.

When fifteen years of age Jessie married a twenty-year-old boy by the name of Amlong, who then lived, and yet lives, in Dallas. After the birth of a baby, that died in a few months, Jessie and Amlong separated and were divorced. Amlong subsequently married another woman, and Jessie married Mr. Cubley. Amlong explained the separation by saying that after the death of the child, "Jessie got music crazy and went away, *met Mrs. Leonard and traveled around.*"

Immediately after the marriage they went to Toledo, Ohio, and lived for a time with Mrs. Partridge, Jessie's mother; but shortly returned to Dallas, and there remained for about a year. Before the baby was born Jessie returned to her mother's at Toledo, to be followed later by Amlong, and there remained until the birth and death of the child,—after which the separation took place as stated above. Jessie, according to Amlong's testimony, was fifteen or sixteen years of age at the time of the marriage; was living with Mrs. Leonard (Mrs. Thyng); and was known by the name of Leonard. Mrs. Leonard (Mrs. Thyng), however, told him that she was an adopted daughter; that her real name was Partridge; and the marriage license was taken out at Mrs. Leonard's (Mr. Thyng's) suggestion in the name of Jessie Partridge. Amlong in part testified:

"Mrs. Leonard was friendly with Jessie and I during that year; she forgave us and came over to see us and talked to us. She would come over to see Jessie and I about two or three times a week. *During that time she did talk to us with regard*

*to the matter of the adoption.\_ She would talk to Jessie and I about the adoption quite often. She said she wanted us to know that Jessie was legally adopted and the papers were on record here in Dallas. She did make a statement with reference to recording the papers; a lawyer here in Dallas recorded them; I believe his name was Mitchell;Colonel Mitchell. As to whether or not I ever heard her make a statement as to where the papers were signed up and acknowledged, they were signed up in Dallas; that is, they were recorded here in Dallas.*

\*     \*     \*     \*     \*     \*     \*

*"Mrs. Leonard said the papers were fixed up in Chicago, to bring back down here to Dallas to be recorded; brought them down here to be recorded. They were signed up in Chicago.*

*"She told us that Jessie and I—that she was the adopted daughter and at her death, she would get her share of the adoption. She stated to us the substance of the papers; she said they was adoption papers. She said the papers provided that Jessie would get her share, as the adopted child of Mrs. Leonard, at her death; at the death of Mrs. Leonard. Mr. Thyng was already dead.* She stated that they adopted Jessie, and also some contract in the same paper. As to whether I can recall anything about what that contract was, the way I understand it, *they was to take Jessie and travel with her as the Music Baby Wonder, and make lots of money with her, and Jessie had a kind of contract that she would get her share of that contract. The adoption paper provided that Jessie would get her share of the estate when Mrs. Leonard died, and also her share of the contract.*

\*     \*     \*     \*     \*     \*     \*

*"As to whether or not there was anything special that causes me to recollect specially about what she said to me, I was Jessie's husband and I was looking out for her interests.*

*"I have heard Mrs. Leonard speak of Jessie's mother. She told me that Mrs. Fuller knew that Jessie was adopted by her. She did state that she had written letters to Jessie's mother in regard to the adoption. She said that she had legally adopted Jessie.*

\*     \*     \*     \*     \*     \*     \*

*"Jessie was going under the name of Jessie Leonard—that is the name Mrs. Leonard had—but I married her under the name of Jessie Partridge, at the suggestion of Mrs. Leonard.* Mrs. Leonard had the license taken out under the name Jessie Partridge. *Mrs. Leonard said that Jessie was her adopted daughter, but that Mrs. Partridge was the mother's real name.*

\*     \*     \*     \*     \*     \*     \*

"It was during this year, or eight or ten months, that I had this talk with Mrs. Leonard I have testified about, when she came over to our house and talked about my relations with Jessie; *she seemed to want us to know, in case anything happened, that Jessie was legally adopted; she wanted to tell us about it; wanted to tell me about it.*

\*    \*    \*    \*    \*    \*    \*

*"She said the adoption papers had been signed and were of record in Dallas.*

\*    \*    \*    \*    \*    \*    \*

*"As to whether it ever occurred to me that my wife and prospective child were very much interested in this matter, and that I ought to go to the County Clerk's office and look and see if this paper was on record, I took Mrs. Leonard's word for it.*

\*    \*    \*    \*    \*    \*    \*

*"I was advised that these adoption papers were signed by Mr. Thyng, as well as Mrs. Thyng. As to whether I concerned myself about whether any part of Thyng's estate had passed to Jessie upon his death, you just remember we were both pretty young at that time. I was twenty years old. I just took Mrs. Leonard's word for it that she was her adopted daughter."*

As we have previously said, many witnesses testified that Mrs. Thyng stated to them that Jessie was her adopted daughter. We deem it unnecessary to quote the testimony. On the testimony of the above and that of other witnesses and other evidence the case went to the jury on special issues. The issues and answers were as follows:

"Special Issue No. 1: Do you find and believe from a preponderance of the evidence that an instrument was signed by Mr. B. F. Thyng while the witness Mrs. Fuller, was in a hotel in Chicago?

"Answer Yes or No. Answer: Yes.

"Special Issue No. 2: Do you find and believe from a preponderance of the evidence that such instrument was then signed by Mrs. Thyng?

"Answer Yes or No. Answer: Yes.

"Special Issue No. 3: Do you find and believe from a preponderance of the evidence that such instrument was one which provided in substance that Mr. and Mrs. Thyng made the child, Jessie Partridge, now Mrs. Cubley, their heir, and that the latter, upon the death of Mr. and Mrs. Thyng, was to have one-half of their property and the other one-half was to go to Mrs. Thyng's son?

"Answer Yes or No. Answer: Yes.

"Special Issue No. 4: Do you find and believe from a preponderance of the evidence that such instrument, if any, was acknowledged by Mrs. Thyng before a Notary Public?

"Answer Yes or No. Answer: Yes.

"Special Issue No. 5: Do you find and believe from a preponderance of the evidence that the Notary Public taking such acknowledgement, if you have found, attested the same?

"Answer Yes or No. Answer: Yes.

"Special Issue No. 6: Do you find and believe from a preponderance of the evidence that Mrs. M. L. Thyng and B. F. Thyng treated and held out to the world the plaintiff as their adopted daughter?

"Answer Yes or No. Answer: Yes."

On this verdict and the undisputed evidence in the case the trial judge entered a decree for plaintiff in error, which, in so far as material here, reads:

"IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED by the Court upon motion submitted and heard this the 30th day of May, A. D. 1928, in accord with said verdict of the jury, that the alleged contract of adoption of Jessie Partridge by Mr. and Mrs. B. F. Thyng, of date January 20, 1888, and the relinquishment contract of that date by the mother of said Jessie Partridge agreeing to her adoption by them be and the same are hereby established and decreed and held to be a legal and valid contract, and is entitled to specific performance and to be enforced in equity, though not a statutory adoption because it was not filed with the County Clerk of Dallas County, Texas."

The defendants in error, Mrs. Barbee et al., appealed and the Court of Civil Appeals reversed and rendered the case in their favor, on the grounds, primarily, that the instrument executed at Chicago was testamentary in character, and not having been executed as wills are required to be was not valid.

■ With this conclusion we can not agree. The deed of adoption and the relinquishment agreement could not be found, and are therefore not in the record, except by the testimony to which we here heretofore made reference.

The evidence of Mrs. Partridge (Mrs. Fuller) and the repeated statements of Mrs. Thyng (Mrs. Leonard) to various parties, including those to Jessie and her husband, the witness Amlong, and the testimony of Munzesheimer leave no room for doubt that the paper executed by Mr. and Mrs. Thyng was one adopting Jessie as an heir under the statutes and was not an agreement to make a will. The paper was prepared in Texas and after execution was examined and approved by a Texas

lawyer and delivered to the lawyer for filing. The only adoption deed which could be filed under the law was a statutory one. In view of the above, taken in connection with Mrs. Thyng's (Mrs. Leonard's) repeated statements that she had adopted Jessie and that the papers were filed in Dallas County, the conclusion, it seems to us, is inescapable that Mr. and Mrs. Thyng intended the paper to be a deed of adoption. Moreover, Mr. and Mrs. Thyng for a year thereafter and until the death of Mr. Thyng, and Mrs. Thyng during the time subsequent, nearly forty years, acted in a manner consistent with the document being a deed of adoption. They could not have an adopted daughter except as an heir under the statutes. Mrs. Thyng's repeated statements that she was an adopted daughter made to old friends in explanation of the presence of the child with her and its relationship to her were not only admissible as admissions of fact but were part of the *res geste* of the acts of the parties in signing the paper at Chicago, and the execution of its terms by Mrs. Thyng, extending from the time the deed of adoption was signed until her death. Burns v. Smith, 21 Mont., 251, 69 Am. St. Rep., 653, 666. Such statements and admissions by Mrs. Thyng in this case, taken in connection with her acts and conduct as an adoptive mother with and toward Jessie, and the acts of the latter as a member of her household were sufficient within themselves to establish the fact of adoption. 1 Texas Jurisprudence, p. 744, sec. 35; Roberts v. Roberts, 223 Fed. 775 (Certiorari denied, 239 U. S., 639); Kay v. Nichaus (Mo.), 249 S. W., 625; Evans v. Kelly, 104 Neb., 712, 178 N. W., 630; Pemberton v. Pemberton, 76 Neb., 669, 107 N. W., 996; Baker v. Payne, 198 S. W., 75.

■ The only feature about the document signed at Chicago which would indicate it was not intended as a mere statutory adoption is the fact that it stated Jessie was to get one-half the estate of the adoptive parents, an amount in excess of the statutory allowance. We do not think, however, that this indicates the instrument was a testamentary one. The statement may have been included therein as a limitation on the right of inheritance given Jessie in the event her foster brother preceded her in death or her adoptive parents were otherwise childless at their demise. We do not say whether it would or would not have been effective for such purpose. We do not know what was in the minds of Mr. and Mrs. Thyng. This clause was placed in the document by the Chicago notary—a lawyer as he was referred to by some witness in detailing a conversation with Mrs. Thyng. Clearly it could not be effective to enlarge the inher-

itance of an adopted heir. 1 Texas Jurisprudence, p. 739, sec. 27; R. S., Art. 43.

We are of the view that the opinion of those who execute a deed of adoption that an adopted heir can inherit more than one-fourth of the estate, where there is a child, although expressed in the instrument itself, can not destroy the validity of such a deed, otherwise valid. The rule is that "Clauses of the instrument which do not have the effect to destroy or impair the full legal effect or a statutory adoption will not render the instrument inoperative." 1 Texas Jurisprudence, p. 727, sec. 15.

On the whole it seems to us that the evidence conclusively shows that the instrument executed by Mr. and Mrs. Thyng at Chicago was an adoption deed and not one of a testamentary character. Winne v. Winne, 166 N. Y., 263, 59 N. E., 832, 82 Am. St. Rep., 647, 650.

As shown by the judgment of the trial court, that tribunal held that the deed of adoption was to be enforced in this case just as though it had been filed with the county clerk of Dallas County. With this conclusion we agree, although under our view of the case the instrument was intended to be a mere statutory adoption of an heir, and therefore the lawful claim of Mrs. Cubley can extend only to one-fourth of the estate left by her foster mother, instead of one-half as declared by the trial court. Our reasons for concluding that Mrs. Cubley is entitled to recover will now be stated. We think that the adoption deed should be given effect just as though it had been in fact filed as provided by law. The fact is that Mr. and Mrs. Thyng executed an adoption deed in favor of this child for reasons satisfactory to them, and by the terms of which they continued its custody of the child previously secured until Mr. Thyng's death, about a year thereafter, and by which Mrs. Thyng secured and continued its custody many years thereafter. Not only did she secure the custody of the child, but an affectionate daughter who sustained that relationship to her up to the very moment of her death. Not only did she obtain an affectionate daughter, but she secured a talented child who produced for her an income over a period of more than nine years, which, as we believe from this record, was in large amount, and which went into the possession of and was devoted to the uses of Mrs. Thyng. We may say in passing that the question as to whether or not Mrs. Thyng being under coverture at the time of the execution of the deed of adoption had power to execute a contract capable of being enforced in the future does not arise in this case. She had the same statutory authority to execute

the deed of adoption that Mr. Thyng had. Neither of them had the power under the common law, but each had the power under the same identical statute. 1 Texas Jur., p. 719, secs. 4, 5, p. 722, sec. 8.

■ After Mr. Thyng's death Mrs. Thyng made the agreement to adopt her own, and as a feme sole carried out its terms, received its benefits, held out the child publicly as her adopted daughter, toured a large of the United States with the child as a musical prodigy, received the receipts from her theatrical engagements, repeatedly told the husband of Jessie, and Jessie herself, that she was an adopted daughter, and that the papers had been filed in Dallas County as provided by law. So, whatever may have been the power of Mrs. Thyng to create an enforceable agreement during coverture, it is plain enough that she adopted her previous agreement under discoverture. Holloway v. Jones (Mo.), 246 S. W., 587, 593; Horton v. Troll (Mo.), 167 S. W., 1081; Sharkey v. McDermott, 91 Mo., 647, 60 Am. Rep., 270.

■ It is to be noted that Mrs. Thyng reported to Mrs. Partridge (Mrs. Fuller), the mother of Jessie, that the deed of adoption was in legal form as provided by the laws of Texas, and that it had likewise been filed in Dallas County as provided by law. *The above representations were, we think, representations of fact in this case, and their correctness can not now be denied for the defendant in error for the reason that they hold in privity with and through Mrs. Thyng, who would be estopped to deny the existence of the state of facts* as represented by her, if she were a party to this litigation. Jessie, the adopted child, in a full measure performed every duty to be performed by her contemplated by the deed of adoption, and it would be a manifest fraud upon her to now permit those who claim under Mrs. Thyng to assert the *invalidity of the adoption proceedings or to assert that the deed of adoption had not been filed.* It seems to us that the rule is correctly stated by the annotator in the notes to the case of Re Taggart, 190 Calif., 493, 213 Pac., 504, 27 A. L. R., page 1365, where the writer states:

"The cases considering the matter are in substantial harmony in sustaining an estoppel in pais to preclude adoptive parents and their privies from asserting the invalidity of adoption proceedings, or, at least, the status of the adopted child, when, by performance upon the part of the child, the adoptive parents have received all the benefits and privileges accruing from such performance, and they by their representations in-

duced such performance under the belief of the existence of the status of adopted child."

Holloway v. Jones (Mo.), 246 S. W., 587; Young v. McClannahan, 187 Iowa, 1184, 175 N. W., 26; Fisk v. Lawton, 124 Minn., 85, 144 N. W., 455; Jones v. Leeds, 41 Ind. App., 164, 83 N. E., 526; Anderson v. Blakesly, 155 Iowa, 430, 136 N. W., 210; Barney v. Hutchinson, 25 New Mexico, 82, 177 Pac., 890; Re Reichel, 148 Minn., 433, 16 A. L. R., 1016; 182 N. W., 517; Milligan v. McLaughlin, 94 Nebr., 171, 46 L. R. A. (N. S.) 1134, 142 N. W., 675; Wolf's Appeal (Pa.), 13 Atl., 760; Re Williams, 102 Calif., 70, 41 Am. St. Rep., 163, 36 Pac., 407; In Re McKeag, 141 Calif., 403, 99 Am. St. Rep., 80, 74 Pac. 1039; Carlin v. Bacon (Mo.), 16 S. W. (2d) 46, 69 A. L. R., 17; Tuttle v. Winchell, 104 Nebr., 750, 178 N. W., 755, 11 A. L. R., 814; Horton v. Troll (Mo.), 167 S. W., 1081; Thomas v. Maloney, 142 Mo. App., 193, 126 S. W., 522.

The annotation quoted is but a concise statement of the rule applied by the authorities cited and any extensive quotation from the cases is perhaps unnecessary. We shall, however, make excerpts from some of the cases.

In Holloway v. Jones, 246 S. W., 587, the Supreme Court of Missouri sustained the rights of a person taken, while an infant, into the family of McHaney and wife, under a promise on the part of the latter to adopt it. We shall not state the facts as the case is available. It is sufficient to say that the child performed all the duties of a child to its adopting parents. The latter, however, never executed the deed of adoption. The suit was between the child after the deaths of the McHaneys and a collateral relative. The Supreme Court sustained the claim of the child. The adoption statutes of Missouri were quite similar to our own.

The Court stated the question for determination as follows:

"The controlling question in this case is whether or not, at the time of the death of Mrs. McHaney, through whom both parties to this controversy claim, the defendant was in equity her adopted daughter. If so, she is the owner in fee of the land in controversy. If not, the title of the plaintiff, who is the natural father of defendant and son of a half-sister of Mrs. McHaney, the common source of title, is the unquestioned owner by inheritance. Everything done in connection with the allegation of adoption was begun and completed while the provisions incorporated in the General Statutes of 1899 upon the subject were in force, which remained unchanged so far as affects this case until the passage of the act of 1917 (Laws 1917, p. 193). The first section is as follows:

" 'If any person in this state shall desire to adopt any child or children as his or her heir or devisee, it shall be lawful for such person to do the same by deed, which deed shall be executed, acknowledged and recorded in the county of the residence of the person executing the same, as in the case of conveyance of real estate.' R. S., 1899, Sec. 5246."

In interpreting and construing the statute quoted, the Court said:

"It will be seen that the proceeding so authorized is purely unilateral. The consent of the natural parents of the child was neither required nor apparently contemplated. Clarkson v. Hatton, 143 Mo., 47, 44 S. W., 761, 39 L. R. A., 748, 65 Am. St. Rep., 635; Reinders v. Koppleman, 68 Mo., 482, 30 Am. Rep., 802; In the matter of Charles B. Clements, 78 Mo., 352. Nor was the consent of the child made necessary. Haworth v. Haworth, 123 Mo. App., 303, 100 S. W., 531. The act of adoption gave the child no right of inheritance not subject to the right of testamentary disposition. It simply constituted him an heir and gave him the same right to support and maintenance and proper treatment as is enjoyed by natural children against their parents. In so far as the instrument possessed any of the elements of contract, it was a contract between the stated and the adopting parent for the use and benefit of the child. Even the word 'child' was not used in its ordinary sense of juvenility, but simply to represent the relation of parent and offspring which it authorized. In re Estate of Moran, 151 Mo., 555, 52 S. W., 377.

"It is evidence that this case is not, in the ordinary sense, a suit to enforce the specific performance of a contract. There is no claim asserted that Mrs. McHaney ever agreed to devise her property to the defendant or to die intestate that the defendant might inherit it. The claim is simply that at the time of the death of Mrs. McHaney defendant was in equity, her adopted child, and as such inherited the property and is now entitled to a decree establishing and enforcing her right. Her status as an adopted child of Mrs. McHaney during her lifetime is the matter in issue, and if it existed it entitled her to the relief she asks."

In holding that an equitable estoppel establishing the status of the child as an adopted one existed under the facts, the Court in part said:

"For the purpose of this case it matters little whether we regard the act of adoption as a status voluntarily assumed with the parental duties and burdens imposed by the statute with the corresponding benefits inuring to the adopted child, (R. S.

1899, sec. 5248), or as a contract of which the child is the beneficiary; their respective rights, obligations, and duties are the same, and these have been enforced in equity by the courts of this state in numerous cases, some of which are the following: Dillman v. Davison (Mo. Sup.) 239 S. W. 505; Remmers v. Remmers (Mo. Sup.) 239 S. W. 509; McCary v. McCary (Mo. Sup.) 239 S. W. 509; Craddock v. Jackson (Mo. Sup.) 223 S. W. 924; Rauch v. Metz (Mo. Sup.) 212 S. W. 357; Fisher v. Davidson, 271 Mo. 195, 195 S. W. 1024, L. R. A. 1917F, 692; Lynn v. Hockaday, 162 Mo. 111, 61 S. W. 885, 85 Am. St. Rep. 480; Granthem v. Gossett, 182 Mo. 651, 81 S. W. 895; Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270. *In all these cases it is held, in substance, that one who takes a child into his home as his own, receiving the benefits accruing to him on account of that relation, assumes the duties and burdens incident thereto, and that where justice and good faith require it the court will enforce the rights incident to the statutory relation of adoption. The child having performed all the duties pertaining to that relation, the adopting parent will be estopped in equity from denying that he assumed the corresponding obligation.* In equity it will be presumed that he did everything which honesty and good conscience required of him in justification of his course. Equity follows the law except in those matters which entitle the party to equitable relief, although the strict rule of law be to the contrary. It is at this point that their paths diverge. As the archer bends his bow that he may send the arrow straight to the mark, so equity bends the letter of the law to accomplish the object of its enactment. In all the cases to which we have referred supra, and in numerous others, this court has consistently held that he who has taken possession of a child in the capacity of an adopting parent cannot escape the duties and liabilities incident to that capacity by failing to follow the forms that the statute has prescribed to that end." (Italics ours.)

In the case of Barney v. Hutchison, 25 N. M., 82, 177 Pac., 890, the Supreme Court of New Mexico, as stated in the head notes, held:

"A contract to adopt a child according to existing statutory law is valid in equity, and where everything required to be done has been performed, except taking the necessary statutory steps to perfect legal adoption, equity will consider that done which ought to have been done, and decree specific performance of the contract, to the end that the foster child shall be entitled to the rights of inheritance prescribed by statute."

In discussing the question at issue the Court adverted to

the proposition that the right of inheritance can not be conferred by contract, citing Jordan v. Abney, 97 Texas, 296, and other cases, and from that rule did not dissent. The court then said:

"Notwithstanding that the contract to adopt the father of the plaintiff in this case made no mention of property rights of the adopted son, we are satisfied that equity and justice demand the specific performance of the contract, to the end that Frank C. Barney be adjudged the adopted son of Annie C. Hutchinson, and that the right of succession of the appellant, the daughter of Frank C. Barney, be recognized in accordance with the statutes in such cases made and provided. In so holding we do no violence to the statutes of inheritance. *We simply hold that equity will consider that Frank C. Barney was in all respects the legally adopted son of the Barneys, and that the surviving spouse of Annie C. Hutchinson, as well as her Collateral heirs, cannot be heard to dispute that which the ancestor would be estopped from asserting.* The laws of inheritance consequently are not impaired, but follow their natural course. They operate upon the relation created by the contract the same as though the legal adoption had taken place." (Italics ours.)

In the case of Young v. McClannahan, 187 Ia., 1184, 175 N. W., 26, a deed of adoption was executed, but, as in the instant case, never filed as required by law. The Supreme Court of Iowa awarded the property to the adopted heir designated in the instrument, in part saying:

"The McClannahans either negligently or designedly failed to record the instrument and thereby obviated the proposed adoption, becoming effective as such. This omission was through no fault of the mother, who departed this life two years after the adoption, nor of the child, who was of tender years, and likely knew nothing of the existence of the paper until too late to record, and neither the McClannahans nor their heirs are in a situation to complain if the instrument before us is construed independently of the statutes of adoption, and the rights derived thereunder enforced precisely as though no such statutes existed. Whatever may have been the original purpose to be effected through the omission to record, the instrument never became other than a mere contract between the parties, and upon performance the cross-petitioner became entitled to 'all the right' which would have pertained. to her, had she been born to the other parties of the agreement in lawful wedlock. Such a child would have inherited all their

estate, real and personal, and therefore she is entitled thereto by virtue of the contract."

In Fiske v. Lawton, 124 Minn., 85, 144 N. W., 455, the court said:

"Moreover, the deceased voluntarily entered into the contract, and pursuant thereto received during her life the benefits of the relation thereby created—the services, society, affection, and devotion of an adopted daughter made her own. No principle of law or equity requires a holding that respondent can avail herself of technical objections to the child's status, the validity of which, so far as appears, remained undisputed by deceased, after full performance of the contractual relations therein involved."

In Jones v. Leeds, 41 Ind. App., 164, 83 N. W., 526, the court, after pointing out that the validity of the adoption proceedings was recognized by the foster mother during her lifetime, and challenged for the first time by her heirs, said:

"Appellees cannot be permitted by a court of equity to take advantage of a wrong, if any, to the prejudice and injury of the innocent party, after the lapse of many years, during all of which time the status of the child, as fixed by the court, has been recognized by all parties to the proceedings."

In the case of Anderson v. Blakesly, 155 Ia., 430, 136 N. W., 210, the Supreme Court of Iowa held:

"A husband and wife executed jointly with the mayor of a 'town' an instrument reciting their adoption, with the mayor's consent, of a certain infant, but the adoption proceedings were invalid because the statute required that the adoption be with the consent of the mayor of a 'city.' Both parties intended in good faith to adopt the child and the husband died believing they had done so and the wife acted upon the same belief for a number of years, and until she was told during the present litigation that the adoption might not have been valid, and the infant adopted lived with her adopted parents until she was married. HELD, that, notwithstanding the invalidity of the articles of adoption, they evidenced a contract right enforceable in equity, after performance by the infant, so that the infant was entitled to what she would have inherited from her adopted father's estate had they been valid, which was his entire estate subject to his widow's rights, dower, or homestead."

In the case of Tuttle v. Winchell, 104 Neb., 750, 178 N. W., 755, 11 A. L. R., 814, 178 N. W., 755, the Supreme Court of Nebraska held:

"A parol agreement of adoption whereby a parent surrenders a child to others upon their promise to adopt, rear, and

educate it as their own, and to give it the same right of inheritance as a natural child, but which is not consummated by a statutory adoption, will, if otherwise fully performed, be enforced in case the adoptive parents die intestate, by decreeing to the plaintiff the same share in their property to which he would have been entitled if the agreement to adopt had been fulfilled."

In discussing the question at issue the Court, in part, said:

"If the promise to adopt the plaintiff had been consummated by formal adoption under the statute, it would have carried with it a child's right of inheritance in the property of Mr. and Mrs. Tuttle. They made no will, and their property was left to descend by operation of law. Equity considers that done which should have been done, and, since the plaintiff's right to the share to which he would have been entitled if legally adopted can be recognized without violating any expressed intention of the deceased to the contrary, the decree awarding him that share was just and equitable. Pemberton v. Pemberton, 76. Neb., 669, 107 N. W., 996."

In the case of Carlin v. Bacon, 322 Mo., 435, 16 S. W. (2d), 46, 69 A. L. R., 1, the Supreme Court of Missouri declared:

"This court has therefore applied to oral contracts of adoption the same rules that are applied to contracts affecting real estate; equity will not permit one party to such a contract to invoke the statute when to do so would work a fraud upon the other. 'It is a rule in equity that, when one party to a contract has been placed in such a situation by a total or partial performance, that it would be a fraud on him if the contract was not fully executed, then equity will interfere, notwithstanding the statute.' Farrar v. Patton, 20 Mo. 81, 84; Gupton v. Gupton, 47 Mo. 37, 46. St. Ann's Foundling Asylum fully executed the oral contract on its part; plaintiff performed it as fully as he was permitted to. The Carlins under color of a contract withdrew plaintiff from the sheltering care of that institution, deprived him of opportunity to be adopted into a home where he would have received humane treatment, and then, after a few brief years drove him forth in his helplessness, with only such chance of succor as general charity might afford. Their representations cannot now take refuge behind the statute."

The above quotations suffice to make plain that the principles of equity are applicable to the facts of the instant case. Many of the cases are referred to in the notes in 27 A. L. R., at page 1365 et seq., to which we are indebted for some of our statements, and are therefore available.

■ In many jurisdictions relief has been granted to those in positions analogous to that of Jessie Cubley here, by decrees of specific performance. See the comprehensive note 27 A. L. R., page 1325 et seq., particularly the cases listed on page 1327. This seems also to be an available remedy in this State. 1 Texas Jurisprudence, 728, sec. 16.

However, we are of the opinion that the real classification of the remedy is that of estoppel. In those cases which designate the proceedings as suits for specific performance, the courts generally recognize that performance can not be decreed within the usual meaning of that term. Of course there is a specific performance in the sense that the naked legal title to property may have been taken by the apparently legal heirs, which the court may divert out of them and vest in the adopted heir. However, the technical classification here is of no consequence. The defendants in error are plainly estopped from asserting the invalidity of the deed of adoption, and from asserting that such deed was not in fact filed as required by the statute. To permit them to do so would be a fraud upon the rights of Jessie Cubley, which a court of equity will not permit.

The judgment of the Court of Civil Appeals is reversed, and that of the District Court is reformed so as to establish the heirship of Jessie Cubley to one-fourth of the estate of Mrs. Leonard, as provided by the adoption statutes, and as reformed is affirmed.