Lester ADLER, Appellant,

v.

Victor MORAN, Jr., et al., Appellees.

No. 15660.

Court of Civil Appeals of Texas, San Antonio.

March 30, 1977.

Rehearings Denied April 27, 1977.

Hall & Zaffirini, Laredo, for appellant.

Goodman & Cronfel, Laredo, for appellees.

CADENA, Justice.

This case involves the application of the doctrine of equitable adoption or, as it is sometimes called, adoption by estoppel. Lester Adler, defendant below, appeals from a judgment, based on jury findings, awarding plaintiffs, Victor Moran, Jr., Xochitl Moran Hernandez, Rene Moran, and Yolanda Moran Couler, an undivided one-half interest in certain land located in Laredo, Webb County, Texas. The judgment is based on the theory that, under the doctrine of equitable adoption, plaintiffs inherited the interest of their stepmother, Ramona Guevara Moran, who died intestate in 1959.

Defendant claims as purchaser of the land in question at a foreclosure sale held in accordance with the provisions of a deed of trust executed by plaintiffs' father, Victor Moran, Sr., as security for a debt incurred by him, after the death of his second wife, Ramona Guevara Moran.

Plaintiffs' natural mother, the first wife of their father, died prior to 1930. In 1930 plaintiffs' father married Ramona Guevara

and lived with her until her death in 1959. It is agreed that the land in question was a part of the community estate of plaintiffs' father and Ramona.

In answer to the first six special issues submitted, the jury found: (1) Prior to her marriage to plaintiffs' father in 1930, Ramona agreed to adopt plaintiffs. (2) As a result of such promise, plaintiffs' father married Ramona. (3) Plaintiffs rendered to Ramona "the same affection, services and duties of natural children" until her death in 1959. (4) Prior to the marriage, Ramona "agreed to assume the duties and burdens of parenthood in relation to" plaintiffs. (5) Ramona raised and cared for plaintiffs from the date of the marriage until her death "as if they had been her own natural children." (6) Plaintiffs lived with Ramona, from the time of her marriage to plaintiffs' father in 1930 until her death in 1959, "in the relationship of sons and daughters" to Ramona, conferring upon her "the benefits of parenthood."

By applying the doctrine of equitable estoppel, the majority of American courts have permitted a person to inherit, under the laws of descent and distribution, as a child of a deceased intestate even though the person claiming the right of inheritance is not the natural child of the deceased and has not been adopted by the deceased in compliance with the requirements of the statutes governing adoption. However, the courts applying the doctrine have experienced some difficulty in explaining the result on the basis of existing legal concepts.

Perhaps a majority of the courts granting relief on the basis of the doctrine of equitable adoption speak in terms of specific performance of a contract to adopt. Annot., 171 A.L.R. 1315, 1316 (1947). Other courts explain the result as an application of the doctrine of equitable estoppel. Annot., 27 A.L.R. 1365 (1923). A few courts repudiate the doctrine of equitable adoption altogether, saying that the adoption statutes furnish the sole means by which a "nonbiological" relationship of parent and child can be created. *Clarkson v. Bliley*, 185 Va. 82, 38 S.E.2d 22 (1946).

There is at least dictum by the Texas Supreme Court to the effect that the remedy of specific performance of a contract to adopt is available in Texas. But this observation is followed immediately by a statement that the "real classification of the remedy is that of estoppel." *Cubley v. Barbee*, 123 Tex. 411, 73 S.W.2d 72, 83 (1934).

In *Cavanaugh v. Davis*, 149 Tex. 573, 235 S.W.2d 972 (1951), the Supreme Court said that a person claiming the protection of the doctrine of equitable adoption must allege and prove either an unsuccessful attempt by the "adoptive parent"[1] to comply with the requirements of the adoption statute or an agreement by the adoptive parent with the child, or with the child's parents or with some other person in loco parentis that he would adopt the child.

In *Cubley*, the Supreme Court, using traditional estoppel language, spoke in terms of precluding "adoptive parents and their privies from asserting the invalidity of adoption proceedings, or, at least, the status of the adopted child, when, by performance upon the part of the child, the adoptive parents have received all the benefits and privileges accruing from such performance, and they by their representations induced such performance under the belief of the existence of the status of adopted child." 73 S.W.2d at 79, 80. The *Cubley* opinion speaks in terms of "representation" rather than "contract," but at least since the *Cavanaugh* decision the Texas courts have consistently required an agreement to adopt.[2]

---

1. The term "adoptive parent" is used to designate the person from whom one claiming under the doctrine of equitable adoption claims to have inherited under the statutes of descent and distribution.

2. No Texas case has attempted to justify the requirement of a contract to adopt. Traditionally, an estoppel results from the detrimental reliance by one person on the representations of another. The representations need not rise to the dignity of a contract. Undeviating adherence to the requirement of a contract to adopt would seem to preclude the finding of an equitable adoption where the adoptive parent has merely represented to the child that a valid

*Grant v. Marshall,* 154 Tex. 531, 280 S.W.2d 559 (1955); *In re Estate of Wood,* 543 S.W.2d 701, 703 (Tex.Civ.App.—Beaumont 1976, no writ).

█ Insofar as the case before us is concerned, combining the "estoppel" language found in *Cubley* with the requirement of a contract to adopt embodied in *Cavanaugh,* it was incumbent on plaintiffs, in order to find shelter in the doctrine of equitable adoption, to prove (1) an agreement by Ramona, made with plaintiffs, or with their father, or with someone standing in loco parentis to plaintiffs to adopt plaintiffs; (2) reliance by plaintiffs upon the existence of the adoptive status; and (3) performance by plaintiffs.[3]

Defendant does not challenge the sufficiency of the evidence to support the findings made by the jury in answer to the first six special issues. Instead, defendant urges that the verdict will not support the judgment because it contains no findings of factual elements essential to the conclusion that plaintiffs were equitably adopted by Ramona, and that the missing findings cannot be supplied under the doctrine of implied findings by the court because the evidence is legally and factually insufficient to support the required findings of fact. Specifically, defendant argues that, although the jury found that Ramona had agreed to adopt plaintiffs, there is no finding that such agreement was made with plaintiffs, or with their father, or with someone in loco parentis, and that absent a finding that plaintiffs knew of the agreement, there can be no basis for concluding that plaintiffs relied on the existence of the agreement to adopt.

We consider first defendant's contention, embodied in its first two points, that there is no evidence or, in the alternative, insufficient evidence, to support an implied finding that the agreement to adopt was made by Ramona with plaintiffs or with plaintiffs' father, or with someone standing in loco parentis to plaintiffs.

The only evidence relating to the agreement by Ramona to adopt plaintiffs came from her brother, Elias Guevara. The record indicates that plaintiffs' father was incapable of testifying because of poor health.

In keeping with custom in Laredo, in 1930 plaintiffs' father called upon Elias Guevara, Ramona's oldest living male relative, to ask for Ramona's hand in marriage. Ramona was present at this meeting, and it is clear that there was some discussion concerning plaintiffs. Elias testified through an interpreter and some difficulty in construing his testimony is created by the fact that frequently the questions and answers were separated by objections by counsel and remarks by the trial judge.

On direct examination, the brother was asked whether there was any discussion concerning the minor children. The answer, as it appears in the statement of facts, was, "No sir. Because—" At this point defendant's attorney objected on the ground that the answer was not responsive. After the court overruled the objection, the witness answered, "Yes, sir." When the witness was asked to explain, defense counsel interjected, "I think that was an answer. Go ahead and just start over." The court

adoption in compliance with the statutory requirements has been accomplished in the past. In order to protect the child who has relied on such representation, a court would be required, somehow, to transform the misrepresentation as to the existence of an antecedent fact into a promise to adopt in the future. Denial of relief would also follow where the representation was to the effect that the child is the natural child of the adoptive parent. It has been suggested that the contract to adopt is essential because it reflects an intention to adopt which, once established, justifies the inference that the intention was in some way communicated to the child, thus permitting the finding of the subsequent reliance said to be essential to an equitable adoption. Bailey, Adoption by Estoppel, 36 Tex.L.Rev. 30, 41, 42 (1937). The reason for permitting reliance only on an intention expressed in a contract is not quite clear.

3. Phrases such as "performance by the child" seem to be no more than a shorthand rendition of the requirement that the child confer love, affection, and other benefits upon the adoptive parent. Our attention has been called to no case in which an attempt was made to define "performance by the child."

then said that the answer was, "No, because my sister agreed to adopt them." Counsel for defendant then stated that he thought the answer had been, No, because "My sister had agreed to adopt them from the beginning."

■ The witness was then asked whether there had been any "discussion or agreement" concerning the children. Defendant's counsel again objected, protesting that the question called for an answer "that has no reference to time or parties involved." After the court commented that the answer was "not yet in the record," defendant objected to the "form" of the question "because it doesn't limit the witness to any particular time or any particular conversation." In response to the court's suggestion that the question be rephrased, plaintiffs' attorney then asked if there had been any discussion concerning the children prior to the marriage. The witness replied, "The same question that you just asked me shouldn't be asked two times." At this point the court pointed out that the word "discussion" means one thing in English while, if literally translated into Spanish, "it means a slightly different thing." He suggested counsel should "try to get something that would be equal both in English and in Spanish." The question was then repeated, with the word "conversation" substituted for "discussion." After an objection by defendant's attorney was overruled, a question was asked inquiring whether there had been any conversation prior to the marriage between Ramona and plaintiffs' father. Before the question could be answered, counsel for defendant pointed out, "Your Honor, there obviously was some conversation before their marriage." The court replied that the witness should be allowed to state whether there had been any conversation. Defendant's attorney then objected that the question was "leading." After this objection was overruled, defendant's attorney requested that the court instruct the witness to answer the question. The statement of facts shows the following:

THE COURT: Mr. Interpreter, will you ask the witness if he can answer that yes or no?
A   Which?
THE COURT: If there was any conversation or agreement.
A   On what?
THE COURT: Now, finish the question.
Q   With reference to the status of the children and their future.
[DEFENSE COUNSEL]: Your Honor, I will object to that as being leading. If there was any kind of agreement—
THE COURT: I will overrule the objection. Go ahead.
[COUNSEL FOR DEFENDANT]: Can the witness be instructed to answer the question yes or no, please?
THE COURT: All right. Mr. Interpreter—
THE INTERPRETER: Yes.
THE COURT: Tell him to answer the question yes or no. We cannot accept any explanation at this time. If there is any explanation required, the attorney will ask for them. So listen to the question and answer it, if you can, yes or no. All right.
A   Yes, sir. There was an agreement.
Q   What kind of an agreement? Would you explain to us, please?
A   My sister said that she was willing to adopt the children and that she would be responsible for all of them and everything.

We cannot say, as a matter of law, that the trial judge could not reasonably conclude that the answer of the witness, when he was finally allowed to give it, was a statement to the effect that the agreement was between Ramona and plaintiffs' father. The judge took an active part in this portion of the proceedings and clearly was in a position to evaluate the answer in what courts like to call "the totality of the circumstances." Plaintiffs' father was present during the conversation, and the conclusion that he was a party to the agreement finds support in the jury finding, unchallenged by defendant, that he married

Ramona "as a result of" her promise to adopt his children.

Defendant's "no evidence" point is overruled.

■ However, we cannot say that the evidence is sufficient to support the finding that the agreement was made with plaintiffs' father. It is settled that a person claiming the protection of the equitable adoption doctrine must establish the facts giving rise to the estoppel by evidence which is "clear, unequivocal and convincing." *Cavanaugh v. Davis, supra,* 235 S.W.2d at 973. In determining whether the evidence in this case satisfied that requirement, we must note the following series of questions and answers during cross-examination of Ramona's brother:

Q And before you would let your sister marry Mr. Moran, you wanted to make sure that your sister understood the obligations that she was getting herself into?

A Of course so. Yes.

Q And the conversation that you had with your sister was to assure you that she understood those obligations?

A That's the way it is.

Q And her agreements were made with you so that you would allow her to get married to Mr. Moran?

A As long as she would adopt his children.

Q And those were the conditions that you placed on the marriage?

A Those were the conditions. Yes, sir.

While the answer of the witness to the question concerning the identity of the person with whom the agreement was made is, at least to some extent, unresponsive, and subject, in any event, to interpretation, this portion of the testimony can be construed as a statement to the effect that Ramona made the agreement with her brother. Under the "preponderance of the evidence" standard for evaluating the quantum of evidence, conflicting answers by a witness raise an issue of fact to be resolved by the trier of fact. Without pretending to define the meaning of the term "clear, unequivocal and convincing," it can be safely said that a requirement of such proof contemplates something more than proof by mere preponderance of the evidence. It must be concluded that the evidence of Ramona's brother is not "unequivocal" and that it is insufficient to support the finding that the agreement to adopt was made with a person who is within the category of those with whom such an agreement must be shown.

■ Defendant's third and fourth points assert that there is no jury finding to the effect that plaintiffs relied on the agreement to adopt, and that the evidence is legally and factually insufficient to support an implied finding of such reliance. This asserted error was not embodied in defendant's motion for new trial. The error, if any, has been waived. *City of Austin v. Daniels,* 160 Tex. 628, 335 S.W.2d 753 (1960).

In answer to issues 7, 8, and 9 the jury found that the Laredo National Bank, at the time it acquired its lien, had knowledge of the fact that plaintiffs claimed an interest in the land and had knowledge of facts sufficient to put a prudent mortgagee on inquiry which, if diligently pursued, would have led to the discovery of plaintiffs' claim. In his fifth and sixth points defendant urges that there is no evidence to support these findings and, in the alternative, that the evidence is insufficient to support such findings.

Defendant's contention is that since the bank paid value for the legal interest, which it acquired under the deed of trust, it was entitled to protection against the equitable interest of plaintiffs unless the evidence establishes that, at the time it acquired its lien, it had actual or constructive notice of plaintiffs' claim. Defendant relies on *Fleming v. Ashcroft,* 142 Tex. 41, 175 S.W.2d 401 (1943). Plaintiffs rely on the rule applied in such cases as *McDougall v. McDougall,* 316 S.W.2d 295 (Tex.Civ.App.— Eastland 1958, writ ref'd n. r. e.), to the effect that one who purchases from an heir must ascertain the identity of all persons

who are entitled to take by inheritance property belonging to the estate of an intestate deceased.

In *Fleming*, the Supreme Court said (175 S.W.2d at 407):

The following excerpt from the opinion of the Court of Civil Appeals in the present case * * * sufficiently discloses the grounds of its holding . . . 'Paraphrasing the conclusions as stated in *Marshburn v. Stewart*, supra, and *Mayor v. Breeding*, supra, both applicable to this record, we conclude that the law having invested [the surviving spouse of the adoptive parent], as survivor of the community, with the apparent legal title in fee simple to this land, and such apparent title having passed to appellants for a valuable consideration, that before [those claiming under the equitably adopted child] can defeat the same, [they] must show that at the time appellants purchased their respective interests they had notice of the equitable rights of [the adopted child], or had notice of facts sufficient to put appellants upon inquiry, and that such inquiry, pursued with reasonable diligence, would have necessarily discovered the real facts upon which [the adopted child's] claim to an interest in the land involved in this suit is predicated. * * * *'

We approve the foregoing holding of the Court of Civil Appeals and the grounds and reasoning upon which it was based.

It is clear that the Supreme Court considered that the interest inherited by a person who successfully invokes the doctrine of equitable adoption is an equitable interest. The opinion expressly distinguishes between a claim based on a statutory adoption and a claim based on an agreement to adopt. 175 S.W.2d at 407. It appears that this distinction can be validly made only if it be assumed that the estoppel does not operate against a purchaser from an heir of the adoptive parent, since it allows such person to show that, for the purposes of inheritance, the child has not been legally adopted.[4]

Basic to the *Fleming* holding is the assumption that on the death of the adoptive parent intestate the legal title to his estate does not vest in the person claiming the protection of the doctrine of equitable adoption. This conclusion finds support in some of the language found in *Cubley v. Barbee*, supra, where the Supreme Court, after pointing out that the doctrine of equi-

4. The judgment of the Texarkana Court of Civil Appeals, which was affirmed by the Supreme Court in *Fleming*, was supported by an opinion interpreting *Jones v. Guy*, 135 Tex. 398, 143 S.W.2d 906 (1940), as holding that the rights acquired by the child were equitable in nature and that the word "privies" as used in the *Jones* opinion included only the devisees of the deceased adoptive parent. *Ashcroft v. Fleming*, Tex.Civ.App., 164 S.W.2d 304, 308 (1942). The conclusion that the word "privies" includes only "devisees" is completely indefensible. The defendants in *Jones* were, indeed, the devisees or legatees of the surviving spouse of the deceased adoptive parent, but the case concerned only succession to the estate of the adoptive parent who had died intestate. It is well settled that the doctrine of equitable adoption cannot be successfully invoked against the devisees of the adoptive parent. The *Jones* opinion makes this abundantly clear. "[T]he effect of sustaining an estoppel in pais to preclude the adoptive parents and their privies from asserting the invalidity of adoption proceedings * * * is not enforcing a parol contract for the sale of real estate. This is true

for the obvious reason that an adopted child does not inherit property in virtue of the status of an adopted child alone *but depends upon the intestacy of the adoptive parent*, together with the statutes of descent and distribution. Moreover, the status of an adopted child with respect to the property of the adoptive parents is the same as that of the parent's own children. . . . [The adoptive parent] had the right to dispose of his property by will, . . . ." 143 S.W.2d at 910. In *Heien v. Crabtree*, 369 S.W.2d 28, 30 (Tex.1963), Chief Justice Calvert said that as a result of the doctrine of equitable adoption, "those claiming under and through [the adoptive parent who died intestate] are estopped to assert that a child was not legally adopted . . . ." This statement, since it presupposes the intestate death of the adoptive parent, exposes the error of the Court of Civil Appeal's statement in *Fleming* to the effect that the estoppel can be invoked only against the devisees of the deceased adoptive parent. The correct rule is exactly the opposite of the rule set forth by the Court of Civil Appeal's opinion in *Fleming*.

table adoption was merely an application of the doctrine of estoppel rather than a remedy decreeing specific performance of the contract to adopt, said, "Of course, there is a specific performance in the sense that the naked legal title to property may have been taken by the apparently legal heirs, which the court may divest out of them and vest in the adopted heir." 73 S.W.2d at 83.

It may be assumed that at the time of the decisions in *Cubley* (1934) and *Fleming* (1943) it could be persuasively argued that upon the intestate death of the adoptive parent the legal title to his estate descended only to his "apparent" legal heirs. However, under present statutes relating to inheritance and adoption there is no basis for holding that on the intestate death of the adoptive parent the title to his estate is, by some unexplained process, divided into "legal" and "equitable" title, with only the "apparent legal heirs" succeeding to the "legal" title.

■ In 1955 the Legislature adopted the present Probate Code which provides that upon the death of a person intestate all of his estate vests "immediately in his heirs at law." Tex.Prob.Code Ann. § 37. Under the provisions of § 38 of the Code, upon the death of Ramona intestate in 1959, her interest in the community estate vested in her "child or children." According to § 3(b), the word "child" includes "an adopted child, whether adopted by any existing or former statutory procedure or by acts of estoppel." Thus, the statute makes a child adopted "by acts of estoppel" one of the "heirs at law" in whom Ramona's estate vested immediately.

■ Prior to 1955, then, there was no statutory provision recognizing a child adopted by acts of estoppel as an heir at law. Since 1955, however, such a child stands, by legislative mandate, on the same footing, insofar as his rights of inheritance are concerned, as a natural child of the intestate or a child adopted by compliance with the statutory provisions relating to adoption. Since our present statutes make no distinction between a natural child, a child adopted by compliance with statutory

requirements, and a child adopted by acts of estoppel, there is no basis for distinguishing among the three types of children. It cannot be seriously argued, without ignoring the statutes, that upon the death of a person intestate the interests which "vest immediately" in the children are somehow different. If natural children and children adopted in compliance with the adoption statute receive the legal title from the intestate parent, then, necessarily, the child adopted by acts of estoppel receives the same quality of title.

Since 1955 there is no basis for the distinction made in *Fleming* between a claim based on "adoption" and one based on "an agreement to adopt." At the time *Fleming* was decided, it could, with some reason, be said that on the death intestate of one of the adoptive parents, 'the law . . . invested [the surviving spouse] . . . with the apparent legal title in fee simple to' the estate of the intestate. 175 S.W.2d at 407. This argument could be advanced because, at that time, no statute existed making children adopted by acts of estoppel the legal heirs of the adoptive parent. In 1959, when Ramona died, the situation had been changed by the Legislature.

■ The holding by the Supreme Court in *Heien v. Crabtree*, 369 S.W.2d 28 (1963), does not support the view that a child adopted by acts of estoppel receives only an equitable interest in the estate of the intestate adoptive parent. The actual holding in that case was merely that an equitable adoption did not create the legal status of parent and child for the purpose of allowing the adoptive parent to inherit from the child. This holding is undoubtedly correct, since the doctrine of estoppel in pais has never been applied in order to protect the adoptive parents. After pointing out that the adoptive parents "Through neglect or design . . . breached their agreement to adopt," the Court pointed out that there would be "no basis in promises, acts or conduct on the part of [the child] upon which to erect an estoppel," since he breached no duty to the adoptive parents or "in any way misled them to their detri-

ment." 369 S.W.2d at 30. The simple holding in *Heien*, then, is that the term "adopted child," as used in the provision in § 40 of the Probate Code, allowing parents by adoption to inherit from an "adopted child," did not include a child adopted by acts of estoppel. That is, there is no statute making the adoptive parent an heir of an equitably adopted child.

It is true that in *Heien* the Supreme Court said that the language of the Probate Code § 3(b), which is a legislative recognition of the doctrine of equitable adoption, indicates a mistaken "legislative assumption that our courts had held that a child may be adopted by acts of estoppel, and thus that a legal status of parent and child is created by acts of estoppel." 369 S.W.2d at 30. Although it is possible to find fault, as did the dissenters in *Heien*, with the notion that the Legislature, in promulgating rules regulating intestate succession, is in some way bound by, and powerless to change, prior judicial holdings, such criticism would serve no useful purpose here. In adopting the rule that a child adopted by acts of estoppel becomes the heir of the adoptive parent, the Legislature correctly analyzed the effect of judicial holdings in cases applying the doctrine of equitable adoption. There is no way out of the Probate Code, even by charging the Legislature with ignorance of judge-made law, the unambiguous declaration of intent that a child adopted by acts of estoppel is the legal heir of the adoptive parent.

Since the statutes place natural children, legally adopted children, and children adopted by acts of estoppel on the same footing, it must be concluded that the interest which plaintiffs acquired in the land in question on the death of Ramona intestate was the complete title, both legal and equitable, rather than a vulnerable equitable interest with the legal title somehow vesting in a person who, under the clear language of the statute, is entitled to inherit nothing. The doctrine of bona fide purchaser is, therefore, inapplicable.

Defendant's fifth and sixth points are without merit.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

BARROW, C. J., concurs in the result.