688 A.2d 475

**Caroline C.R. GERAMIFAR**

v.

**Gholam R. GERAMIFAR.**

**No. 511, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 3, 1997.

**496**

Dorothy R. Fait (Brian D. Wise and Fait & Malament, on the brief), Rockville, for Appellant.

Brian D. West (Mark A. Barondess, Milissa R. Spring, Sandground, Barondess, West & New, P.C., on the brief), Vienna, VA, for Appellee.

Argued before WENNER, DAVIS and SALMON, JJ.

WENNER, Judge.

It may be said that cases involving the custody and support of children are among the most divisive, and this case is no exception. Appellant, Caroline Geramifar, appeals from a judgment of the Circuit Court for Montgomery County that appellee, Gholam Geramifar, "does not have a legal duty to support the minor child, Ashkan Geramifar, born on November 5, 1992,...." On appeal, appellant inquires whether the trial court erred in concluding that appellee has no legal duty to support Ashkan.

We will respond in the affirmative, vacate the judgment of the circuit court, and remand the case to that court for further proceedings consistent with this opinion.

## Facts

Gholam and Caroline Geramifar were married in Rockville, Maryland, on 7 May 1976. Although they were interested in having children, they were unable to do so. Thus, they

traveled to the Republic of Iran, appellee's native country, in an attempt to procure for adoption a child of Iranian heritage. They were successful. In December of 1992, they obtained guardianship of an infant male named Ashkan. After participating in an Iranian proceeding enabling them to return to the United States with Ashkan, appellee returned to the Republic of Iran in August of 1993 to finalize Ashkan's paperwork. An Iranian Court granted the parties guardianship of Ashkan in August 1993.[1]

For reasons that are unclear, the parties separated on 20 December 1993. Appellee subsequently filed a complaint in the Circuit Court for Montgomery County seeking a limited divorce and custody of Ashkan. Appellant responded with a counter-claim, seeking a limited divorce and custody of Ashkan, as well as other relief. A bitter custody dispute then ensued. Initially, the parties fought vigorously over custody of and visitation with Ashkan, resulting in a flurry of temporary orders. As the Geramifars had not begun adoption proceedings in the United States, their only relationship to Ashkan was the guardianship granted them by the Iranian court.

It appears that appellee was seeking custody of Ashkan so that the child would be raised in an Iranian household and taught to speak Farsi.[2] On the other hand, appellant was concerned that appellee would flee with Ashkan

---

1. A review of the testimony offered in the many hearings on this matter reveals that in Iran a guardianship is similar, but not the same, as an adoption in the United States. In Iran, for instance, under certain circumstances, the natural parents can reclaim the child. Moreover, the Iranian government has a continuing role in the life of the child, even when the child is living with its guardians. If Iranian officials perceive that the child's new home has become unstable for any of a number of reasons, it may reclaim the child.

2. It should be noted that appellee, not appellant, is a native of the Republic of Iran. Importantly, appellee informed Iranian officials during the guardianship proceedings that Ashkan would be raised in a Muslim household, and would be taught to speak Farsi. Moreover, appellee's Iranian heritage was apparently an important consideration

to Iran.  Accordingly, the court had directed that appellee's visits with Ashkan be supervised.  In addition, appellee was prohibited from leaving the United States with Ashkan.

To appellant's surprise, appellee abandoned his quest for custody of Ashkan on the eve of the custody hearing, and agreed that appellant should have custody of Ashkan, and that he would not visit him.  Appellee also waived his right to adopt Ashkan.  Judge James S. McAuliffe, who was to preside over the custody hearing, signed an order memorializing the agreement and remanded the case to the Domestic Relations Master, to determine, among other things, child support.  As the Master interpreted Judge McAuliffe's order as not requiring child support from appellee, he recommended no child support.

Appellant noted exceptions and the matter was held before Judge Leonard L. Ruben.  Concluding that appellee was presumptively required to contribute to Ashkan's support, Judge Ruben remanded the case to the Master to determine the appropriate amount.

Upon the Master recommending child support, both parties noted exceptions.  According to appellee, he had no duty whatever to support Ashkan.  According to appellant, the sum recommended by the Master was inadequate.

On this occasion, the matter was held before Judge William C. Miller.  After considering the parties' exceptions, Judge Miller concluded that appellee had no duty to support Ashkan, and this appeal followed.

### Equitable Adoption

Maryland is among those jurisdictions recognizing equitable adoption, *see Clayton v. Supreme Conclave Improved Order of Heptasophs,* 130 Md. 31, 99 A. 949 (1917), which was aptly defined in *McGarvey v. State:*

Equitable adoption is sometimes called "adoption by estoppel," "virtual adoption," or "de facto adoption."  By whatev-

---

when Iranian officials were considering granting the parties guardianship of Ashkan.

er name it is known, the doctrine in general involves the notion that if an individual who is legally competent to adopt a child enters into a contract to do so, and if the contract is supported by consideration in the form of part performance that falls short of completion of statutory adoption, then a court, applying equitable principles, may accord to the child the status of a formally adopted child for certain limited purposes.

311 Md. 233–234, 533 A.2d 690 (1987).[3] Until now, however, the doctrine of equitable adoption has been employed in Maryland only to determine issues of inheritance.

For example, the Court of Appeals said in *McGarvey, supra,* 311 Md. 233, 238, 533 A.2d 690, "... we are prepared to assume that Maryland does recognize the doctrine of equitable adoption...." Nonetheless, the *McGarvey* Court held that an equitably adopted child was not entitled to the status of a formally adopted child for purpose of favorable inheritance tax treatment. Further, the Court of Appeals said in *Board of Education v. Browning,* 333 Md. 281, 635 A.2d 373 (1994), "that an equitably adopted child may not inherit from her adoptive parent's sibling."

Notably, Maryland has yet to determine whether the doctrine of equitable adoption is an appropriate vehicle for com-

---

**3.** In their briefs, both parties also argued the merits of this case under a theory of equitable estoppel. We find that the doctrine of equitable estoppel is not applicable to this case, however. "[I]t is well settled that specific terms covering a given subject matter prevail over general language of the same or another statute which might otherwise prove controlling." *Montgomery County v. Lindsay,* 50 Md.App. 675, 678–79, 440 A.2d 411 (1982), *citing Baltimore National Bank v. State Tax Commission of Maryland,* 297 U.S. 209, 56 S.Ct. 417, 80 L.Ed. 586 (1936). The doctrine of equitable adoption is a more specific doctrine than is the doctrine of equitable estoppel.

Both parties also rely heavily on the case of *Knill v. Knill,* 306 Md. 527, 510 A.2d 546 (1986) to support the proposition that equitable estoppel is an appropriate doctrine under which to analyze this case. However, in *Knill,* the parties never agreed to adopt the child, nor did they ever commence any adoption proceedings. Thus, the doctrine of equitable adoption would not have been applicable in *Knill,* and the *Knill* Court properly analyzed the case under a theory of equitable estoppel.

pelling an adoptive parent to pay child support.[4] As Judge Miller acknowledged, however, "the instant case would seem to be a textbook example of an equitable adoption."

■ As we have said, the parties journeyed to the Republic of Iran for the purpose of obtaining guardianship of Ashkan for the purpose of adopting him in the United States. While in Iran, they visited the appropriate agency, acquired Ashkan, and followed the required procedures to obtain guardianship of Ashkan and returned to the United States. Following their initial visit, appellee returned to the Republic of Iran, completed the necessary paperwork, and returned with Ashkan to the United States. In order to obtain guardianship of Ashkan, the parties promised each other and the Republic of Iran that they would care for the child. Thus, the parties entered into a contract to adopt Ashkan.

In sum, we agree with Judge Miller's observation that this case is a textbook example of equitable adoption. According to Judge Miller, "[t]here was a contract between husband and wife to adopt and to care for and support this child." However that may be, Judge Miller went on to conclude that "[t]his contract, however, like all other contracts, can be modified or terminated by the subsequent agreement of the parties." Judge Miller further opined, "giving up his [appellee's] adoptive, visitation and custodial rights . . . is consideration for the termination of the earlier agreement. . . ." Appellee "no longer has rights with respect to [Ashkan]. He no longer has duties with respect to [Ashkan]." We do not agree.

---

**4.** Our review of the approach taken by other jurisdictions reveals that they differ greatly. While some jurisdictions implicitly recognize that the doctrine of equitable adoption entitles an equitably adopted child to be supported by its adoptive parent, *Sargeant v. Sargeant*, 88 Nev. 223, 495 P.2d 618 (1972); *Young v. Young*, 545 S.W.2d 551 (Tex.Civ.App. 1st Dist.1976); *Frye v. Frye*, 103 Nev. 301, 738 P.2d 505 (1987), other jurisdictions have held to the contrary, *see*, *Fuller v. Fuller*, 247 A.2d 767 (D.C.App.1968) (declining to recognize the doctrine of equitable adoption for any purposes); *Trevino v. Garcia*, 627 S.W.2d 147 (Tex. 1982) (declining to recognize the doctrine of equitable adoption where state statute required a judicial order for adoption).

### The Subsequent Agreement

As we said earlier, appellee abandoned his request for custody of and visitation with Ashkan, on the eve of the custody hearing. As a result, the parties agreed that appellee would forego his rights to custody or visitation.[5] As we have also mentioned, Judge McAuliffe memorialized this agreement in a judgment terminating appellee's quest for custody of and visitation with Ashkan, terminating all rights to Ashkan he may have had.

Judge McAuliffe then remanded the case to the Master to determine, among other things, "support and maintenance of the minor child...." On remand, the Master concluded that Judge McAuliffe's order terminated appellee's adoptive rights, and Judge Miller also agreed that the parties' new agreement had terminated appellee's obligation to support Ashkan. Again, we do not agree.

■ Contracts may ordinarily be modified or terminated by subsequent agreement of the parties. *See Thomas v. Hudson Motor Car Co.*, 226 Md. 456, 460, 174 A.2d 181 (1961). Nevertheless, not all terms of a contract may be negotiated, although the parties are bargaining at arm's length. For example, "[A] court ... is not bound in the amount fixed by the parents for the support of a child. It is free to adopt the amount agreed upon and incorporate it in its decree as its own, but it is not bound to do so." *Zouck v. Zouck*, 204 Md. 285, 296, 104 A.2d 573 (1954).

### Agreements Regarding Child Support

■ "The law and policy of this State is that the child's best interest is of paramount importance and cannot be al-

---

5. According to counsel for appellee, appellee's change of heart stemmed from wanting what was best for Ashkan. Appellee was not interested in engaging in continuous bantering over the child, as he believed that it would be detrimental to Ashkan. Nor did he believe, based on the breakdown of their marriage, that he would have an opportunity extensively to participate in Ashkan's life. Thus, appellee believed that it would be best for all concerned if he abandoned his pursuit of custody of and visitation with Ashkan.

tered by the parties." *Shrivastava v. Mates,* 93 Md.App. 320, 327, 612 A.2d 313 (1992). While it is true that a court has jurisdiction to terminate a parent's obligations, parties are ordinarily not free to do so. Thus, once it was established that appellee was Ashkan's equitably adoptive parent, his obligations could be terminated only by order of the court. "Generally, the duty to support one's minor children may not be bargained away or waived." *Stambaugh v. Child Support Enforcement Admin.,* 323 Md. 106, 111 591 A.2d 501 (1991).

In *Stambaugh,* an agreement was reached by parents, in which the mother agreed to waive the father's liability for past or future child support in consideration of the father's consenting to his children being adopted by the mother's new husband. The Court of Appeals said that the mother's attempt to exchange her children's right to support from their natural father in exchange for their father's consenting to their adoption was in violation of well-settled public policy.

We believe that such would be the situation here if an agreement abrogating his equitably adoptive father's duty to support Ashkan were condoned. Whether or not intended, the parties' subsequent agreement relieved appellee of his obligation to support Ashkan. Although this agreement may well have been reached by the parties' arms length bargaining, we decline to enforce it. Indeed, it appears that Judge McAuliffe also declined to do so. This is evidenced by his remanding the case to the Domestic Relations Master for a determination of child support.

■ In its role as *parens patriae,* it is the duty of a court to consider the child's best interest. In the case at hand, it is obviously not in Ashkan's best interest to relieve appellee from his obligation to support him. Rather, it is in Ashkan's best interest to be supported by those who were permitted to bring him to the United States from the Republic of Iran, after promising the Republic of Iran to support and care for him.

■ "In this paternalistic role, the State imposes the obligation upon the parents to maintain, care for and protect their

children. The State may regulate this custodial relationship whenever necessary, and virtually without limitation when children's welfare is at stake." *Kennedy v. Kennedy*, 55 Md.App. 299, 309–310, 462 A.2d 1208 (1983), *citing Townsend v. Townsend*, 205 Md. 591, 596, 109 A.2d 765 (1954). Thus, as the parties' agreement, the effect of which relieves appellee from his duty to support Ashkan, violates public policy, we decline to enforce it. Moreover, as we have pointed out, among other things, Judge McAuliffe's order remanded the case to the Master of Domestic Relations to determine "support and maintenance of Ashkan."

Hence, having equitably adopted Ashkan, appellee has a duty to contribute to his support. This duty could neither be bargained away, nor was it abrogated by Judge McAuliffe's order. Accordingly, we shall vacate the judgment of the circuit court and remand the case to that court to consider appellant's exceptions and determine, as Judge McAuliffe put it, the "support and maintenance [due] Ashkan" from appellee.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**