*In re: The Estate of Michael Gerard Schappell*, No. 2048, September Term, 2022. Opinion by Eyler, James R., J.

**EQUITABLE ADOPTION –** The test for equitable adoption is one of fairness, considering all relevant circumstances including evidence of the intent of the decedent to treat the putative child as a natural or adopted child and the circumstances demonstrating that the decedent and the putative child functioned as a parent and natural or adopted child would function. The evidence must be clear and convincing.

**ORPHANS' COURT – TRANSFER OF ISSUES –** Equitable adoption is a mixed question of law and fact and may be transferred to a circuit court.

**JURY TRIAL –** Equitable adoption is an equitable remedy. When first level facts are not in dispute, whether equitable adoption exists is decided by a judge, not a jury.

Orphans' Court for Montgomery County
Case No.: W108952

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2048

September Term, 2022

_____

IN RE: THE ESTATE OF
MICHAEL GERARD SCHAPPELL

_____

Berger,
Shaw,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, James R., J.

_____

Filed: February 28, 2024

*Albright, Anne, J. did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In 2021, Michael G. Schappell, decedent, died intestate, leaving no surviving spouse, natural children, siblings, parents, or grandparents. Karen Ellis, the decedent's stepdaughter and appellee, filed a Petition For Judicial Probate and a Petition for Determination of Heir in the Orphans' Court for Montgomery County. Relying on the doctrine of equitable adoption, appellee sought to be treated as the child of decedent for purposes of intestate succession. Karen Daniel, Paul Schappell, and Anne O'Boyle, appellants and intestate heirs of the decedent, filed a petition for summary judgment. Appellee filed a petition to transmit issues of fact to the Circuit Court for Montgomery County for trial by a jury. The orphans' court denied appellants' petition for summary judgment and granted appellee's petition to transfer issues for trial by jury. This appeal followed.

Had the orphans' court's ruling been limited to the denial of the petition for summary judgment, the ruling would have been unappealable. Regardless, as explained below, the orphans' court had discretion to deny the motion and proceed to a more fully developed record. Thus, the denial of the motion, even if it could have been granted, would not have been reversible error.

It is the granting of the motion to transfer issues that brings this matter to this Court. As explained below, we conclude that the orphans' court erred in granting the motion to transfer issues for trial by jury and shall remand the case to the orphans' court for further proceedings consistent with this opinion.

# BACKGROUND[1]

Ms. Ellis, born on September 23, 1974, is the natural daughter of Carol Schappell and Kenneth Klenk. Ms. Schappell and Mr. Klenk separated in 1977. From the time of her birth until 1977, Ms. Ellis resided with her natural parents. In 1979, Ms. Schappell married the decedent. Ms. Ellis resided solely with Mr. Klenk until 1988, when she was fourteen. From 1988 to 1992, Ms. Ellis resided part of the time with Mr. Klenk and part of the time with the Schappells. Once she turned 18, in 1992, Ms. Ellis did not reside with either Mr. Klenk or the Schappells.

On December 8, 2019, Ms. Schappell died. On May 29, 2021, the decedent died intestate. He left no living spouse, children, parents, siblings, or grandparents. The record reflects that Mr. Klenk is still alive. On November 24, 2021, Ms. Ellis filed a petition for judicial probate and a petition for determination of heir in the orphans' court.

In the latter petition, Ms. Ellis alleged the following. From the day the decedent married her mother, he "was a constant father figure" in Ms. Ellis's life. He was "very involved" in her education and helped her with schoolwork. Despite not residing together, the decedent was "present to help mold [Ms. Ellis's] character during [her] formative years[,]" helping her with all "aspects [of] life [with which] a father would help a daughter." They spent birthdays, Father's Days, and other holidays together. As years passed, the decedent attended Ms. Ellis's graduations, her wedding, and baptisms for her children. Ms. Ellis's husband asked for the decedent's blessing—which he gave—before

---

[1] The facts are based on the parties' petitions, oppositions, answers to interrogatories, affidavits, and other exhibits filed in the orphans' court.

proposing marriage to her. The decedent always was available when Ms. Ellis needed advice or assistance with anything. She always was available when he needed the same.

The decedent never legally adopted Ms. Ellis, but throughout his life, he introduced her to people as his daughter. He referred to her husband as his son-in-law and to her children as his grandchildren. When the decedent's father died in 2015, the decedent wrote his obituary in which he referred to Ms. Ellis and her children as his father's granddaughter and great-grandchildren. Nevertheless, the decedent never told Ms. Ellis or, to her knowledge, anyone else that he intended, desired, or promised to adopt her. Ms. Ellis and the decedent jointly planned Ms. Schappell's funeral.

When Ms. Schappell died, all of her assets were held jointly with the decedent or the decedent was the beneficiary. Consequently, all of her assets transferred to the decedent.

The decedent relied heavily on Ms. Ellis after Ms. Schappell's death. Ms. Ellis arranged to have groceries delivered to his home. She called and emailed him multiple times per week to keep in touch and make sure he was all right. When the decedent's health deteriorated, Ms. Ellis was the main point of contact. When the decedent was hospitalized for six days in August 2020, Ms. Ellis and her husband traveled to Maryland from their then home in North Carolina to coordinate with the medical providers and manage the decedent's household. Soon after, the decedent told Ms. Ellis that he wanted to move to North Carolina to be closer to her, and she assisted with his planning. The record is unclear, but presumably, due to health issues, he never completed the move.

3

During his life, the decedent often told Ms. Ellis he intended to leave all his assets to her. He would tell her, "when [your mother and I are] gone, all of this will be yours," and, "one day, all of this will be yours[.]" The decedent stated that he planned to have estate planning documents drafted to that effect. He named Ms. Ellis as the beneficiary under his sole life insurance policy.

In the petition for determination of heir, Ms. Ellis asserted her belief that the decedent was survived by aunts, uncles, and their children, but had limited information with respect to any of the relatives. Based on the doctrine of equitable adoption, Ms. Ellis sought an order declaring her to be the child of the decedent for purposes of inheritance.

On December 22, 2021, the orphans' court denied appellee's petition of determination of heir, without explanation. On January 13, 2022, Ms. Ellis filed a motion for reconsideration. On January 24, 2022, the orphans' court denied the motion but without prejudice "nunc pro tunc to December 22, 2021[,]" presumably to allow Ms. Ellis to identify interested persons to be notified.

On April 29, 2022, Ms. Ellis filed a second petition for determination of heir. The petition was substantively the same as the first petition but it certified notice to all of the interested persons who had been identified.

On May 13, 2022, Karen Daniel, a surviving cousin and appellant herein, was appointed as personal representative of the estate. Appellants filed a petition to dismiss Ms. Ellis's petition, arguing that, as a matter of law, the petition failed to state a cause of action for equitable adoption. The orphans' court denied the motion without explanation.

4

Following discovery, appellants petitioned for summary judgment, arguing that the undisputed facts could not support Ms. Ellis's claim of equitable adoption. Ms. Ellis opposed the petition and filed a petition to transmit issues. In October 2022, the orphans' court held a non-evidentiary hearing on both petitions.

At the end of the hearing, the orphans' court determined that the facts, as presented by Ms. Ellis, did not, as a matter of law, preclude equitable adoption. The orphans' court denied summary judgment without prejudice and issued an Order transmitting issues to the circuit court. The seven issues transmitted were:

1. Was there some sort of an arrangement between Michael G. Schappell and Karen Ellis that would give rise to an implication of an intention by Michael G. Schappell to equitably adopt Karen Ellis?

2. Was there performance of that arrangement on the part of Karen Ellis?

3. Did Michael G. Schappell receive all the benefits and privileges accruing from such performance by Karen Ellis?

4. By their arrangement was Karen Ellis induced to perform under the belief that she occupied the status of an adopted child of Michael G. Schappell?

5. Was there a promise by Michael G. Schappell to Karen Ellis that she would be treated as an adoptive child?

6. Was there an express promise that Karen Ellis would be entitled to receive Michael [G.] Schappell's estate?

7. Is Karen Ellis the equitably adopted child of Michael Gerard Schappell?

Appellants timely appealed.[2]

---

[2] An orphans' court's order transmitting issues to the circuit court is appealable. *Banashak v. Wittstadt*, 167 Md. App. 627, 685 (2006).

Appellants present the following questions for our review which we have rephrased for clarity:

1. Did the orphans' court err in granting appellee's petition to transmit issues?

2. Did the orphans' court err in denying appellants' petition for summary judgment?

## STANDARD OF REVIEW

In reviewing the orphan's court's decision, we will not set aside its factual findings unless clearly erroneous. *In re Watkins*, 241 Md. App. 56, 70 (2019). In contrast, we give no deference to its legal conclusions and review them *de novo*. *Id.* In the realm of transmitting issues, "[i]t is impermissible to submit an issue which poses a pure question of law, but an issue which raises a mixed question of law and fact may be submitted to a jury under proper instructions[.]" *Nugent v. Wright*, 277 Md. 614, 620 (1976) (internal citation omitted).

## DISCUSSION

Adoption and inheritance are related creatures of statute. *Hall v. Vallandingham*, 75 Md. App. 187, 189, 192 (1988). We have observed previously that "[t]he primary purpose for adoption was, and still is, inheritance rights[.]" *Id.* at 189. Maryland's adoption requirements are codified in § 5-331 *et seq.* of the Family Law Article of the Maryland Code. Only if the adoptive parents meet the statutory criteria and follow the statutory procedures to finalize the adoption will a child enjoy the status of a member of the adoptive family and the associated inheritance rights. *See McGarvey v. State*, 311 Md. 233, 240–41 (1987).

6

Those rights, however, are not "natural right[s] but a privilege granted by the State" and governed by our Estates and Trusts Article. *Hall*, 75 Md. App. at 192. Where, as here, a decedent dies without a will, Maryland's intestacy statute sets forth a line of succession. *See* Md. Code Ann., Estates & Trusts ("ET") § 3-101 *et seq*. As with all intestacy statutes, its aim "is to make such a will for an intestate as he would have been most likely to make for himself[.]" *Barron v. Janney*, 225 Md. 228, 234–35 (1961). *See also In re Est. of North Ford*, 200 A.3d 1207, 1213 (D.C. 2019) ("The hierarchy of succession set forth in the intestacy statute is meant to approximate the distributional choices we expect most decedents would make within a family structure."); *Est. of Ford*, 82 P.3d 747, 753 (Cal. 2004) ("The law of intestate succession is intended to carry out the intent [of] a decedent without a will is most likely to have had." (cleaned up)). Under Maryland's intestacy statute, a stepchild inherits from an estate only if the decedent had no surviving blood relatives. ET § 3-104(c).

Our intestacy statute is not absolute, however, and may be supplemented by applying principles of equity to further its goals. *See Bd. of Educ. of Montgomery Cnty. v. Browning*, 333 Md. 281, 289 (1994).

## I. *Equitable Adoption in General*

Sometimes called "adoption by estoppel," "virtual adoption," or "de facto adoption," the doctrine of equitable adoption allows "individuals to circumvent the statutory adoption procedures for certain limited purposes." *Id.* at 287. Each of these labels is somewhat of a misnomer, however, because even when the requirements are met, "no relationship of parent and child is created and consequently, [with rare exceptions,] an

7

equitably adopted child does not attain the status of a statutorily adopted child." *Id. See also* 2 AM. JUR. 2d *Adoption* § 63 (2018 ed.). The term "doctrine" is similarly misleading as there is "no widely agreed upon animating principle, much less an established test[.]"[3] *North Ford*, 200 A.3d at 1213.

Both in terms of requirements and consequences, courts' applications of equitable adoption principles run the gamut across jurisdictions. On one end of the spectrum, a minority of states do not recognize an equitable adoption as such. Their reasoning, generally, is that the application of equitable principles clashes with their state's intestacy statute. *See*, *e.g.*, *Wilks v. Langley*, 451 S.W.2d 209, 213 (Ark. 1970) ("The mere contract to adopt is not sufficient of itself to make a child a legal heir of the promisor, because the right to take as heir exists only by operation of the law." (cleaned up)); *Smith v. Atl. Coast Line R. Co.*, 47 S.E.2d 725, 727 (S.C. 1948) ("[T]he method of adoption provided by . . . statute [is] exclusive."); *Clarkson v. Bliley*, 38 S.E.2d 22, 26 (Va. 1946) ("[I]n the matter of inheritance there is no place for equitable considerations, whether springing from contract or from a course of conduct." (cleaned up)). Nevertheless, at least some of these

---

[3] A more apt description of the concept might be "de facto parent-child relationship" that exists for the purpose in question in a given case. This is especially true in Maryland, one of the states that has applied the doctrine to issues other than intestate succession, *see Clayton v. Supreme Conclave, Improved Order of Heptasophs*, 130 Md. 31 (1917) and *Geramifar v. Geramifar,* 113 Md. App. 495 (1997) discussed below. That said, for consistency's sake, we will continue using the generally accepted terminology throughout this opinion. Equitable adoption and de facto parenthood are different concepts. Ordinarily, the issue in equitable adoption is intestate succession. The issue in de facto parenthood is standing to seek custody or visitation of a child. *See Conover v. Conover*, 450 Md. 51 (2016). The considerations overlap, but they are not necessarily the same.

courts recognize that an enforceable contract, even one related to inheritance, may result in an award of damages.

On the other end, without addressing criteria at the moment, West Virginia stands alone in determining that an equitably adopted child enjoys the same status as a formally adopted child. *See Wheeling Dollar Sav. & Tr. Co. v. Singer*, 250 S.E.2d 369, 373 (W. Va. 1978). In *Wheeling Dollar*, the Supreme Court of Appeals of West Virginia reasoned that "[a]n equitably adopted child in practical terms is as much a family member as a formally adopted child and should not be the subject of discrimination." *Id.* In the almost 40 years since *Wheeling Dollar*, however, no other state has adopted West Virginia's stance that the status resulting from equitable adoption is identical to the status resulting from statutory adoption. West Virginia's criteria for applying the doctrine are not unique, however, although the requirements are very stringent.[4] The fact that they do not rest on contract has support in other jurisdictions.

_____

[4] Circumstances which tend to show the existence of an equitable adoption include: the benefits of love and affection accruing to the adopting party, *Foster v. Cheek*, 212 Ga. 821, 96 S.E.2d 545 (1957); the performances of services by the child, *Lynn v. Hockaday*, 162 Mo. 111, 61 S.W. 885 (1901); the surrender of ties by the natural parent, *Chehak v. Battles*, 133 Iowa 107, 110 N.W. 330 (1907); the society, companionship and filial obedience of the child, *Oles v. Wilson*, 57 Colo. 246, 141 P. 489 (1914); an invalid or ineffectual adoption proceeding, *Benefield v. Faulkner*, 248 Ala. 615, 29 So. 2d 1 (1947); reliance by the adopted person upon the existence of his adoptive status, *Adler v. Moran*, 549 S.W.2d 760 (Tex. Civ. App. 1977); the representation to all the world that the child is a natural or adopted child, *In re Lamfrom's Estate*, 90 Ariz. 363, 368 P.2d 318 (1962); and the rearing of the child from an age of tender years by the adopting parents. *Lamfrom's Estate, supra.* Of course, evidence can be presented which tends to negate an

(continued…)

Maryland has expressly recognized equitable adoption. *Browning*, 333 Md. at 289. Maryland has expressly rejected the position that the status resulting from equitable and statutory adoption is the same for all purposes, however. *McGarvey*, 311 Md. at 240 ("[W]e are surely not prepared to go as far as West Virginia has gone.").

The remaining states that have adopted the doctrine of equitable adoption also agree that an equitably adopted child does not gain the same status and protections as a statutorily adopted child outside the specific context in which the doctrine is applied. *See*, *e.g.*, *North Ford*, 200 A.3d at 1213. *See also* 2 AM. JUR. 2d *Adoption* § 63 (2018 ed.) (acknowledging that equitable adoption "is not intended or applied to create the legal relationship of parent and child, nor is it meant to create a legal adoption" (footnotes omitted)).

In terms of rationale, states fall into three camps. *See North Ford*, 200 A.3d at 1213–16. First are the states that ground their application of equitable adoption in principles of

---

equitable adoption such as failure of the child to perform the duties of an adopted child, *Fisher v. Davidson*, 271 Mo. 195, 195 S.W. 1024 (1917), or misconduct of the child or abandonment of the adoptive parents, *Winne v. Winne*, 166 N.Y. 263, 59 N.E. 832 (1901); however, mere mischievous behavior usually associated with being a child is not sufficient to disprove an equitable adoption. *Tuttle v. Winchell*, 104 Neb. 750, 178 N.W. 755 (1920). Most of the cited cases predicate the finding of an equitable adoption on the proof of an expressed or implied contract of adoption. While the existence of an express contract of adoption is very convincing evidence, an implied contract of adoption is an unnecessary fiction created by courts as a protection from fraudulent claims. We find that if a claimant can, by clear, cogent and convincing evidence, prove sufficient facts to convince the trier of fact that his status is identical to that of a formally adopted child, except only for the absence of a formal order of adoption, a finding of an equitable adoption is proper without proof of an adoption contract.

*Wheeling Dollar*, 250 S.E.2d at 373–74.

10

implied contract and specific performance.[5] *See, e.g., Calista Corp. v. Mann*, 564 P.2d 53, 62 (Alaska 1977); *Barlow v. Barlow*, 463 P.2d 305, 308–09 (Colo. 1969). Our Supreme Court has stated that courts applying this theory "enforce the promise of the adoptive parent [against their estate,] provided that sufficient consideration is given in return for the promise of adoption." *Browning*, 333 Md. at 288.

Next are the states that rely on principles of equitable estoppel, including detrimental reliance, to support their application of equitable adoption. *See, e.g., In re Painter's Est.*, 67 N.W.2d 617, 618–19 (Iowa 1954); *Cubley v. Barbee*, 73 S.W.2d 72, 79–80 (Tex. 1934). Under this theory, "the personal representative of the estate of the adoptive parent is estopped from asserting that the child was not an adopted child." *Browning*, 333 Md. at 288. The situation arises "'when, by performance upon the part of the child, the adoptive parents have received all the benefits and privileges accruing from such performance, and they by their representations induced such performance under the belief of the existence of the status of adopted child.'" *Id.* (quoting *Jones v. Guy*, 143 S.W.2d 906, 908 (Tex. 1940)).

Third and finally, representing what may be the current trend, are the states that seek generally to promote fairness and to honor the decedent's intent. *See, e.g., North Ford*, 200 A.3d at 1214; *DeHart v. DeHart*, 986 N.E.2d 85, 103 (Ill. 2013); *Ford*, 82 P.3d at 754. Under this approach, for purposes of inheritance at least, the focus is not on whether a

---

[5] In *North Ford*, 200 A.3d at 1214, the District of Columbia Court of Appeals suggested that Maryland falls into this group, citing our Supreme Court's decision in *Browning*, 333 Md. at 287–88. As we discuss below, however, Maryland has not expressly adopted any specific equitable adoption theory.

contract was formed or whether there was reliance by the child but rather on "ensuring that the decedent's wishes regarding the disposition of her property are realized" and whether the child was functionally the child of the decedent. *North Ford*, 200 A.3d at 1214. Resting on a "*de facto*, lifetime-family-member rationale," *First Nat'l Bank in Fairmont v. Phillips*, 344 S.E.2d 201, 204 (W. Va. 1985), this theory analyzes a set of factors aimed at discerning the decedent's intent, subjectively and objectively, to treat the child the same as a natural or adopted child along with other relevant circumstances demonstrating a close and enduring familial relationship. *See DeHart*, 986 N.E.2d at 103–04; *Ford*, 82 P.3d at 753–54; *Wheeling Dollar*, 250 S.E.2d at 373–74.

## II.     *Equitable Adoption in Maryland*

Appellants, the legal heirs, contend that Maryland applies either the specific-performance theory or the estoppel theory of equitable adoption but that it does not matter which because both require an express agreement to adopt. According to appellants, the undisputed facts show no such agreement. Consequently, the orphans' court should not have transmitted any issues but, instead, granted them summary judgment. Ms. Ellis, in contrast, contends that Maryland has not adopted any particular theory of equitable adoption and urges that we should adopt the flexible fairness approach. Regardless, in her view, the facts demonstrate an implied agreement by the decedent to adopt her with the consequence of making her his beneficiary.

Maryland appellate courts have discussed equitable adoption only a few times, sometimes in dicta. The prior cases largely focus on circumscribing the doctrine's reach, rather than determining its threshold criteria. We review them here.

A. *Clayton v. Supreme Conclave, Improved Order of Heptasophs*, 130 Md. 31 (1917)

Before the doctrine had a name, our Supreme Court laid the foundations for equitable adoption in a case about life insurance benefits.

William Montgomery was a member of what the Court described as a "mutual order[.]" *Clayton*, 130 Md. at 35. The Order issued Mr. Montgomery a certificate by which it promised to pay $1,000 on Mr. Montgomery's death to his named beneficiaries, whom he identified as his "adopted children John Carves and Annie Carves[.]" *Id.* at 32 (quotation marks omitted). The children were Mr. Montgomery's niece and nephew by marriage. *Id.* at 33. They lived with him after their parents died, from the time they were three and five years old. *Id.* But when Mr. Montgomery died, the Order sought to avoid payment. *Id.* It contended that the children had not been adopted, and that under the Order's laws, only natural children or "children by legal adoption" could be beneficiaries. *Id.* at 34 (quotation marks omitted).

The Court upheld the designation of beneficiary. *Id.* at 37. It observed that Mr. Montgomery reared the children "as though they were his own[.]" *Id.* at 33. During the relevant time period, there was no statute in effect providing for a "legal" adoption.[6] *Id.* at 35. Acknowledging that, the Court stated: "What was done amounted to an adoption in fact, and was so acted upon by both the [children] and Mr. Montgomery during [his] life." *Id.* at 33.

---

[6] Maryland's first adoption statute was enacted in 1892, two years before Mr. Montgomery joined the Order and was issued the certificate, but "some ten or eleven years" after he "had in fact adopted the children[.]" *Clayton*, 130 Md. at 35.

In discussing its reasoning, the Court referenced, among other things, cases in other states addressing property rights. It stated that they:

> generally establish the proposition, that a parole obligation by a person to adopt the child of another as his own, accompanied by the virtual though not statutory adoption, and acted upon by both parties during the obligor's life, may be enforced upon the death of the obligor, who dies without disposing of the property by his will; nor is such a contract rendered invalid by statutory provisions requiring the execution of wills to be in writing.

*Id.* at 36–37.

This quote could lead one to believe that the Court's decision was resolved on contract principles. But another factor the Court noted was that Mr. Montgomery made the beneficiary designation more than two decades before his death, and the Order accepted his dues and assessments the whole time without question. *Id.* at 33–34. That and other references—to us—sound in estoppel. *See generally id.* Indeed, when discussing this decision in later cases, the Supreme Court describes its holding as such. *See, e.g.*, *McGarvey*, 311 Md. at 239 (stating that *Clayton* "applied an estoppel theory"); *Besche v. Murphy*, 190 Md. 539, 545–46 (1948) (describing *Clayton* as holding "that the Heptasophs were estopped from raising the question that the children were not entitled to the proceeds"). Another relevant consideration in applying estoppel was that Mr. Montgomery's intent that his equitably adopted children be paid under the certificate was manifest and clear. *See Clayton*, 130 Md. at 33.

B.  *Besche v. Murphy*, 190 Md. 539 (1948)

Three decades after *Clayton*, our Supreme Court considered another case touching on equitable adoption.

14

Annie Ripple died testate. *Besche*, 190 Md. at 541. The residuary clause in her will provided that the rest and residue of her estate would go to "those persons who under the laws of the State of Maryland would take in case of intestacy." *Id.* (quotation marks omitted).

The claimant under the residuary clause lost her parents when she was a young child. *Id.* She was then cared for by an "elderly aunt[.]" *Id.* Three to four years later, when the claimant was about eight years old, Ms. Ripple and her then husband offered to adopt her on the condition that all care was relinquished to them. *Id.* The claimant then lived with Ms. Ripple and her husband "as their daughter." *Id.* at 542. Ms. Ripple and her husband told the claimant: "'We are adopting you, we will be good parents to you.'" *Id.* at 541–42. They changed her name (first and last). *Id.* at 542. But they never completed the legal adoption process. *Id.*

The Court observed that the elderly aunt was *in loco parentis* and that words and actions could support the finding of an agreement by the aunt to relinquish all rights. *Id.* at 545. In discussing cases from other jurisdictions, the Court stated that a non-consummated agreement to adopt can be enforced with respect to the right of inheritance, the agreement can be oral, and that the basis is "the full performance of the contract by the child[.]" *Id.* at 547.

The Court held, however, that Ms. Ripple did not die intestate and that the residuary estate passed under the will. *Id.* at 550. Thus, the statute of intestate succession controlled and could not be amended by the Court—*i.e.*, the child did not inherit from the estate. The holding is logical because a contrary result would have disregarded Ms. Ripple's clear and

15

manifest intent based on the language in the will that expressly referred to the intestacy

"'laws of the State of Maryland.'" *Id.* at 541. A reasonable interpretation of the language

is that it meant statutory intestacy laws.

With respect to an agreement, in reviewing cases from other jurisdictions, the Court

observed that, generally, "there must be an agreement to adopt[.]" *Id.* at 548. The opinion

is notable, however, in that it recognizes that an agreement to adopt can be oral and can be

proved by conduct. *Id.*

C. *McGarvey v. State*, 311 Md. 233 (1987)

Almost forty years after *Besche*, Maryland formally recognized the doctrine of

equitable adoption for the first time.

In *McGarvey*, the factual basis for equitable adoption existed and was not disputed:

the child's natural parents and the decedent agreed that the latter would adopt the child, but

the decedent "never got around to" completing the formal adoption process. *McGarvey*,

311 Md. at 235. When the equitably adoptive parent died, she named the child as the sole

legatee under her will. *Id.* The question was whether an equitably adopted child was subject

to the rate of tax for collateral or lineal descendants. *Id.* at 234. Based on statutory language

governing inheritance tax, the Court concluded that "children" includes only formally

adopted children and equitable adoption is not enough to provide favorable tax treatment.

*Id.* at 241–42.

The Court stated that, in general, the doctrine of equitable adoption:

involves the notion that if an individual who is legally competent to adopt a
child enters into a contract to do so, and if the contract is supported by
consideration in the form of part performance that falls short of completion

16

of statutory adoption, then a court, applying equitable principles, may accord to the child the status of a formally adopted child for certain limited purposes.

*Id.* at 234.

We note that the *McGarvey* Court characterized the facts in *Besche* as being sufficient to find an equitable adoption. *Id.* at 236 ("In *Besche*, Stella Besche alleged facts that would have established an equitable or virtual adoption."). Again, that Court recognized that any requisite agreement can be proved by conduct. *Besche*, 190 Md. at 548.

D. *Board of Education of Montgomery County v. Browning*, 333 Md. 281 (1994)

Paula Browning's natural father, Lawrence Hutchison, married Marian Gibson. *Browning*, 333 Md. at 283. Ms. Browning was reared in the Hutchison–Gibson household. *Id.* Ms. Gibson died. *Id.* She had a sister: Eleanor Hamilton. *Id.* Ms. Hamilton died intestate without any heirs. *Id.* Ms. Browning claimed a right to inheritance from her step-aunt's estate based on equitable adoption. *Id.* at 283–84.

The Supreme Court assumed that Ms. Browning had been equitably adopted, *id.* at 286, but held that the status did not entitle her to inherit from Ms. Gibson's sister's estate. *Id.* at 293. The Court reviewed the elements of equitable adoption, in a footnote, and said that it has been explained under two theories: specific performance of a contract to adopt or estoppel based on performance by the child and the receipt by the adopting parent of the benefits and privileges accruing from that performance. *Id.* at 287 n.3. The Court also stated that the theory employed is unimportant because application of the doctrine is the same: "The courts under either theory focus upon the equities involved and require 'clear and

17

convincing evidence' of the adoption contract." *Id.* at 288 (quoting *McGarvey*, 311 Md. at 238).

Interestingly, before stating the above, the Court explained that the basis of the doctrine "is that it is inequitable and unjust to allow the parent to escape the obligations of an adoptive parent by failing to comply with the agreement[,]" referring to *Thompson v. Moseley*, 125 S.W.2d 860, 862 (Mo. 1939). *Browning*, 333 Md. at 287.

That said, the equities in *Browning* are not the same as in the case before us. Ms. Browning's claim was *through* her equitably adoptive parent, not from, and, as such, there was no adequate basis for finding intention or estoppel. *But see id.* at 298 (Eldridge, J. dissenting) ("In effect, the Court has said today that . . . [Ms.] Hamilton . . . would have preferred to leave her estate to the government rather than to [Ms.] Browning who, although never formally adopted, presumably because of oversight, was a member of the family for over seventy years. I do not believe that such a result would have been intended by the deceased."). This case illustrates the difference between the West Virginia decisions determining the status of an equitably adopted child is for all purposes as distinguished from specific purposes.

E.  *Geramifar v. Geramifar*, 113 Md. App. 495 (1997)

The most recent Maryland appellate decision on equitable adoption is this Court's only reported opinion on the subject. It also arises outside the context of intestate succession.

Gholam and Caroline Geramifar married in 1976 but were unable to have children. *Geramifar*, 113 Md. App. at 497. In 1992, after deciding to adopt a child of Iranian heritage,

18

they successfully obtained guardianship of an infant named Ashkan from an Iranian court. *Id.* at 498. A year later, the parties separated without having begun formal adoption proceedings in the United States. *Id.* Mr. Geramifar announced that he did not want custody or visitation, waived his right to adopt, and refused to provide child support. *Id.* at 499. This Court observed that the case was "a textbook example of equitable adoption." *Id.* at 501. Interestingly, in doing so, we described the doctrine of equitable adoption as a specific form of equitable estoppel. *Id.* at 500 n.3. We ultimately held that, as an equitably adoptive parent, Mr. Geramifar could not shirk the responsibility of support without court approval. *Id.* at 504.

### III. *Analysis*

We glean from the above cases that Maryland will enforce an unconsummated contract to adopt. *See McGarvey*, 311 Md. at 238; *Geramifar*, 113 Md. App. at 500. We also note, however, that no such contract or agreement was alleged in *Browning*, where the Court assumed the requirements of equitable adoption were met, presumably because one could have been inferred or implied from the surrounding circumstances and representations of the decedent. *See Browning*, 333 Md. at 284.

In our view, Maryland precedent does not require us to hold that a contract or agreement to adopt, express or implied in fact, is *required.* We are mindful that equitable adoption has continued to develop since 1997, when the most recent Maryland case was decided, and in that time has been recognized by courts applying principles of fairness,

19

looking to the intention of the decedent and all relevant circumstances.[7] We conclude that this approach fits within Maryland precedent, and its rationale is sound.

Exclusive reliance on principles of estoppel, as employed by some courts, is questionable. Equitable adoption is a form of equitable relief employed to "supplement the law as applied to particular circumstances[.]" *Equity*, BLACK'S LAW DICTIONARY (11th ed. 2019). A court employing equitable principles to fill a statutory gap should do so only to further the statute's aim or purpose. *See Manning v. Potomac Elec. Power Co.*, 230 Md. 415, 421–22 (1963). *Cf. Equitable Tr. Co. v. Imbesi*, 287 Md. 249, 261 (1980) (stating that when interpreting lien instruments, "equity looks rather at the final intent and purpose than at the form" (cleaned up)). As mentioned above, the purpose of Maryland's intestate statute "is to make such a will for an intestate as he would have been most likely to make for himself[.]" *Barron*, 225 Md. at 234–35. Although applying equitable estoppel is not inconsistent with the legislative intent because it seeks to implement the decedent's likely intent, it follows, however, that equitable estoppel should be employed to further the *decedent's* interest, not the putative child's interest or detrimental reliance by the child, and the analysis should focus on intent and overall relationship.

The pure estoppel rationale has been criticized because "it seems unlikely that a putative child, particularly one taken in by the decedent as an infant, would have altered his behavior or performance depending on whether he expected to inherit[.]" *North Ford*,

---

[7] Although this rationale underlies West Virginia's application of the doctrine, as noted above, Maryland has expressly rejected West Virginia's reasoning only with respect to the result of equitable adoption—*i.e.*, that it creates a *status* identical to a legal adoption. *See McGarvey*, 311 Md. at 240.

20

200 A.3d at 1214. And again, "the equitable interest is in ensuring that the decedent's wishes regarding the disposition of [their] property are realized[,]" not in the child's inheritance right. *Id.*

The specific-performance theory of equitable adoption has been similarly criticized as it "diverts the inquiry from discerning to whom the decedent would have wanted to distribute [their] property to examining whether a contract was formed." *Id.* Additional problems arise when identifying the parties to that contract and the requisite consideration. Logically, a minor child lacks capacity to enter into an enforceable contract to be adopted. It follows that the child must instead be a third-party beneficiary of a contract between others, presumably the adoptive parent and the natural parent or legal guardian of the child. But this contradicts the requirement by courts using this theory that the child give "filial affection, devotion, association[,] and obedience to the [adoptive parent] during the latter's lifetime[,]" to satisfy the consideration element. *In re Lamfrom's Estate*, 368 P.2d 318, 321 (Ariz. 1962). If the child was a third-party beneficiary to the adoption contract, no performance or consideration would be required from them. *See WM. T. Burnett Holding LLC v. Berg Bros. Co.*, 235 Md. App. 204, 212–13 (2017). Thus, we find the doctrine of equitable adoption is not well-suited to the logic of specific performance.[8]

---

[8] Illinois recognizes a cause of action, which it calls a "contract-to-adopt" theory, as separate and distinct from the doctrine of equitable adoption. *See DeHart*, 986 N.E.2d at 98–101. It is functionally identical to the specific-performance theory except that it clarifies that the child is a third-party beneficiary to the contract and, as such, not obligated to perform or provide consideration to be entitled to seek specific performance of the contract for succession purposes. *Id.* at 100.

In *Browning*, our Supreme Court observed that any distinction between equitable estoppel and specific performance is meaningless because "[t]he courts under either theory focus upon the equities involved and require 'clear and convincing evidence' of the adoption contract." 333 Md. at 288 (citation omitted). As just discussed, however, requiring a contract to adopt presents an analytical quandary.

We note that several courts have discussed the uncertain and confusing rationale for equitable adoption, and some have changed their rationale over time. For example, in Texas, early cases focused on representations and detrimental reliance—the classic elements for equitable estoppel. *See, e.g., Cubley*, 73 S.W.2d at 79–80. Later, a contract requirement was added, which makes the rationale look more like specific performance. A later court noted that the addition of a contract requirement seems antithetical to an estoppel theory because, traditionally, "[t]he representations need not rise to the dignity of a contract." *Adler v. Moran*, 549 S.W.2d 760, 762 n.2 (Tex. Civ. App. 1977), *rev'd on other grounds sub nom.* 570 S.W.2d 883 (Tex. 1978). The court questioned why a contract was required for a theory resting on estoppel, recognizing that this—seemingly arbitrary—requirement precluded relief in otherwise clear cases of equitable adoption—*e.g.*, "where the representation was to the effect that the child is the natural child of the adoptive parent." *Id.*

That leaves the fairness rationale, with focus on the decedent's intent and all other relevant circumstances, supported by evidence of facts demonstrating that the stepchild-parent relationship was treated as a de facto parent-child relationship. In our view, the underpinnings of this rationale can be found in our Supreme Court's earlier

22

decisions in *Clayton* and *Besche.* There, the Court placed a clear emphasis on assessing and furthering the decedent's intent—*i.e.*, the decedent's equitable interest along with other circumstances. *See Besche*, 190 Md at 150; *Clayton*, 130 Md. at 33. The rationale can also be inferred from the Court's holding in *McGarvey.* If the Court viewed the equitable interest as lying in the child's inheritance right, it presumably would have furthered that interest by subjecting the child to the tax rate for lineal descendants rather than collateral ones. The Court's contrary decision suggests, instead, that the equitable interest is in ensuring that the decedent's property went to whom the decedent would have wanted. The decedent had no interest in the rate at which that property might be taxed.

We find nothing inconsistent in the Court's decision in *Browning* in which the Court limited application of equitable adoption to the parent-child relationship. Clearly, the doctrine has been applied sparingly and for good reason. The more attenuated the familial relationship, the less likely it is an intestate decedent would have included an equitable relative in a will had the decedent executed one. That reasoning is mirrored in the intestacy statute's hierarchy of succession. "[I]n an area of law where consistent, bright-line rules are greatly needed[,]" *Ford*, 82 P.3d at 753 (cleaned up), confining the doctrine's reach merely frees future courts from the burden of delving into whether an equitably adopted child was close enough with a deceased, intestate extended-equitable-family member for the court to infer that the decedent would have intended to leave the decedent's estate to the child.

The conclusions we express are limited to the issue of intestate inheritance, the issue before us. We conclude that if a person seeks to establish that they are an intestate

23

decedent's equitable child and heir, the person must prove that they and the decedent, objectively and subjectively, intended to and did live as child and parent. We stress from the outset that it is insufficient merely to prove that a close familial relationship existed between the decedent and the putative child.

Rather, a putative child claiming equitable adoption must prove that the decedent intended to treat them as the decedent's own child and that the child was "functionally," as the District of Columbia Court of Appeals put it, the decedent's child. *See North Ford*, 200 A.3d at 1214. The intent element is not necessarily an intent to *statutorily* adopt. Rather, the intent is that the child be regarded and treated the same as a natural or legally adopted child. In the context of intestate succession, this intent may be proved by the totality of the circumstances, including evidence that the decedent represented to both the child and the world that the child was the decedent's child and by evidence demonstrating that intent.

As noted above, it is not essential to prove the existence of an express contract or agreement to adopt although such evidence is relevant. Moreover, evidence of an intent to devise is different from an intent to treat a child the same as an adopted child and, standing alone, cannot prove equitable adoption. In other words, equitable adoption is not tantamount to equitable inheritance or equitable estate planning. On the surface, this may appear to clash with our statement that the purpose of the intestacy statute is to "make such a will for an intestate as he would have been most likely to make for himself[.]" *Barron*, 225 Md. at 234–35. But the statute rests on the presumption that, absent a living spouse, an intestate decedent would most likely have left the estate to the decedent's natural or legally adopted children had the decedent died testate. Thus, it is reasonable to require

24

proof that a decedent intended a putative child to be treated as the decedent's natural or legally adopted child and that they, in fact, treated the child as such before declaring the child an heir.

This approach recognizes that the relationship between a stepchild and a stepparent may vary greatly from family to family. A stepchild may live with a stepparent from infancy to majority and beyond and be treated as a child for all purposes. In our view, there is every bit as much equitable justification for finding an equitable adoption in this type of case as there is in a case with an unconsummated adoption contract as required by some courts. To not recognize an equitable adoption in such cases would be manifestly unjust and contrary to the decedent's clear intent to treat and continuously hold out the putative child as the decedent's natural or legally adopted child.

On the other hand, a stepchild might not live with a stepparent and/or may have no meaningful relationship with a stepparent, especially when the stepparent enters the child's life when the child is an adult. As an equitable remedy, to accommodate these variations, the doctrine of equitable adoption must be flexible enough to permit a "right result" on the facts of each case while providing as much guidance as reasonably possible. It is often impossible or inadvisable to attempt to fashion too fine a standard, and this is especially true in the context of equitable relief where the principles need to be pliable enough to permit an equitable result on the facts. After all, the result is to depart from the strict letter of the law in order to achieve equity.

Courts in other jurisdictions have set forth various criteria to be considered. *See, e.g., North Ford*, 200 A.3d at 1215; *Wheeling Dollar*, 250 S.E.2d at 373–74. Some or all

of those criteria may be relevant in a particular case. In determining the intent of the decedent and assessing whether the decedent and putative child functioned as a parent and natural or adopted child would function, the court should consider all relevant circumstances related to the relationship between the decedent and the putative child, including but not limited to:

- Whether the decedent cared for the putative child and took charge of the child's health, education, and general welfare until the child reached the age of majority, as a parent would;

- Whether the decedent expressly agreed or promised to adopt the putative child but failed to do so;

- Whether the decedent made an invalid or unconsummated attempt to adopt the putative child;

- Whether the putative child was incorporated into the decedent's broader family;

- Whether the decedent gave the putative child the decedent's surname;

- Whether the decedent represented to others in the community that the decedent was a parent to the putative child;

- Whether the putative child continued to maintain a relationship with the child's biological family and, if so, if that relationship conflicted with the decedent assuming the role of parent to the putative child;

- Whether the natural parent or guardian expressly or implicitly consented to the relationship, the effect of which could affect the child's right to inherit from the natural parent under Maryland's intestacy laws;[9] and

- Any other act or statement directly showing that the decedent *intended the child to be, or to be treated as*, a natural or legally adopted child and facts demonstrating how the relationship functioned.

Consistent with courts in other jurisdictions, the standard discussed herein is a high bar—one that we anticipate will rarely be cleared. As noted above, a putative child must prove an equitable adoption claim by clear and convincing evidence.

## IV.    *Conclusion*

Procedurally, in this case, the orphans' court denied, without prejudice, appellants' petition for summary judgment. That petition was supported by Ms. Ellis's answers to interrogatories. Ms. Ellis opposed the petition, supported by an affidavit and other exhibits. In addition, the orphans' court granted Ms. Ellis's petition to transmit issues for trial by jury. Appellants filed an opposition, supported by answers to interrogatories.

The record reflects that, beginning with Ms. Schappell's marriage to the decedent, the decedent was a father figure in Ms. Ellis's life. He referred to Ms. Ellis as his daughter. "On numerous occasions, [he] stated his intent to leave all of his assets to [Ms. Ellis]." He

---

[9] *See* ET § 1-207(a) ("[O]n adoption a child may not be considered a child of either natural parent" except that "[o]n adoption by the spouse of a natural parent, the child shall still be considered the child of that natural parent.").

also stated his intent to have his "estate planning documents drafted to that effect[.]" And he named Ms. Ellis as the beneficiary on his only life insurance policy.

The record also reflects, however, that in her answers to interrogatories, Ms. Ellis conceded that she was "unaware of any communication in which [the decedent] evidenced any intention, desire, or promise to adopt her." She does not contend that he would have done so "but for a legal barrier." There is no evidence that the decedent took any steps in furtherance of estate planning other than naming Ms. Ellis on his life insurance policy. Ms. Ellis did not move into the decedent's home until a decade after his marriage to Ms. Schappell, and even then, the home was not "permanent" as Ms. Ellis split time living with the Schappells and her natural father. The record reflects that Mr. Klenk is alive. There is no indication as to whether he is aware of this proceeding or has taken any position with respect to it.

Regardless of whether the orphans' court could have granted appellants' summary judgment motion, the orphans' court did not commit reversible error in denying it. *See Metro. Mortg. Fund, Inc. v. Basiliko,* 288 Md. 25, 28 (1980) ("[W]hereas a court cannot draw upon any discretionary power to grant summary judgment, it, ordinarily, does possess discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits; and this discretion exists even though the technical requirements for the entry of such a judgment have been met." (cleaned up)). Although this proceeding is governed by Title 6 of the Maryland Rules, we see no reason why the orphans' court should be treated differently from the circuit court with respect to the above discretion. Ms. Ellis's answers to interrogatories identified

28

several potential witnesses who could testify as to the nature of the relationship between her and the decedent. It may be that there is relevant evidence in addition to that which was presented on motion. The orphans' court is allowed to develop a full record.

With respect to the transferability of issues, we conclude that the doctrine of equitable adoption is a mixed question of law and fact because it "involve[s] the application of law to fact[.]" *Furda v. State*, 193 Md. App. 371, 409 (2010) (cleaned up). A mixed question may be transmitted to a circuit court. *See Kao v. Hsia*, 309 Md. 366, 378 (1987). On the current record, issue 7 is the only issue that can be transmitted. It is the ultimate question that is determined by applying the facts to applicable principles and is thus a mixed question of law and fact. The first 6 issues are factual in nature and may be considered by a court, along with other considerations, in reaching its determination. Nevertheless, the first-level facts are not in dispute. It is a question of applying them to reach a conclusion. Consequently, we cannot affirm the order transferring issues to the circuit court. We vacate that order.

On remand, the orphans' court, if requested by a party, may transfer issue 7 to the circuit court. If the matter is not transferred, the orphans' court may proceed to determine the issues before it. If the orphans' court does not transfer the issue, and proceeds to an evidentiary hearing, disputes as to first-level facts may develop.

One other observation is in order. The order transferring issues ordered the issues to be tried by a jury. Equitable relief, at least ordinarily, is not triable by jury. *Mattingly v. Mattingly*, 92 Md. App. 248, 255 (1992). Issue 7 presents the ultimate issue and, if transferred, it is not subject to trial by jury. Currently, as noted above, first-level facts are

29

not in dispute. The parties have not briefed the question of right to a jury trial. If a factual dispute arises and the orphans' court again grants a motion to transfer, we express no opinion on whether any fact issues are triable by a jury as distinguished from a judge.

**ORDER TRANSFERRING ISSUES TO CIRCUIT COURT BY THE ORPHANS' COURT FOR MONTGOMERY VACATED. CASE REMANDED TO THE ORPHANS' COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY APPELLANTS AND ONE-HALF BY APPELLEE.**